# United States Court of Appeals
## For the First Circuit

No. 18-1675

ROSEMARY WANJIKU,

Petitioner,

v.

WILLIAM P. BARR,
UNITED STATES ATTORNEY GENERAL,[*]

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Lynch, Circuit Judge,
Souter,[**] Associate Justice,
and Stahl, Circuit Judge.

Duane M. Hamilton, Esq. on brief for petitioner.
Joseph H. Hunt, Assistant Attorney General, Civil Division,
Terri J. Scadron, Assistant Director, and Corey L. Farrell,
Attorney, Office of Immigration Litigation, Civil Division, U.S.
Department of Justice, on brief for respondent.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Attorney General
William P. Barr has been substituted for former Attorney General
Jefferson B. Sessions, III as the respondent.

[**] Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

March 15, 2019

**STAHL**, **Circuit Judge**. Petitioner Rosemary Wanjiku, a native and citizen of Kenya, seeks review of an order by the Board of Immigration Appeals ("BIA") denying her motion to reopen removal proceedings based on changed country conditions. Wanjiku was first ordered removed to Kenya in 2013, but she did not leave the country at that time. More than three years later, in 2016, she sought to reopen proceedings, claiming that conditions within Kenya had changed since her prior removal proceedings and now supported a claim for asylum. An Immigration Judge ("IJ") denied her motion, concluding that the conditions complained of were continuing, not changed, and the BIA affirmed that decision on June 22, 2018. After careful review, we find the BIA did not abuse its discretion and deny the petition accordingly.

## I.

On or about March 19, 2000, Wanjiku entered the United States at Newark, New Jersey, with authorization to remain for a temporary period, not to exceed September 18, 2000.[1] Wanjiku remained in the country well past that date and, on July 19, 2010, she married a U.S. citizen. Shortly thereafter, the couple filed papers to adjust Wanjiku's status to that of a permanent resident

---

[1] We draw the facts as set forth below from the administrative record, including sworn statements and other documents that Wanjiku presented in support of her application. See Tota v. Gonzales, 457 F.3d 161, 163 (1st Cir. 2006).

alien.  The Department of Homeland Security ("DHS") notified Wanjiku's spouse of its intent to deny the application, and the couple sought to withdraw their respective petitions in June 2012.

On July 16, 2012, DHS issued Wanjiku a Notice to Appear (the "Notice"), which charged Wanjiku with removability for remaining in the United States beyond the term authorized by her visa in violation of 8 U.S.C. § 1227(a)(1)(B).  The Notice separately alleged that Wanjiku's marriage was a sham and constituted a fraudulent attempt to procure an immigration benefit, and so charged her with removability under 8 U.S.C §§ 1182(a)(6)(C)(i) and 1227(a)(1)(A).  Wanjiku conceded removability for overstaying her visa, but denied any fraud.

At a hearing held on April 22, 2013, DHS withdrew the fraud charge, electing to seek Wanjiku's removal only for overstaying her visa.  Wanjiku did not file an application for relief or seek adjustment of her status, however, and at the conclusion of the hearing, the IJ ordered Wanjiku removed to Kenya. Wanjiku did not preserve her appeal and took no further action at that time.

Wanjiku remained in the United States despite the removal order and, on September 28, 2016, she filed a motion to reopen removal proceedings to pursue "asylum and related humanitarian claims based on changed circumstances and country conditions."  See 8 C.F.R. §§ 1003.2(c)(2); 1003.23(b)(4)(i).

- 4 -

Wanjiku alleged that a confluence of factors, including an attack on her daughters (who remained in Kenya), had made her fearful of returning there and thus, for the first time, eligible for asylum. The following discussion provides an overview of the factual claims Wanjiku presented in support of her motion.

Wanjiku belongs to a sub-clan "governed by a council of elders who make important decisions for [her] people." "[I]ts over [2,000] members can be found all over Kenya," and "the elders can mobilize sub-clan members throughout the nation to carry out [their] wishes." In 1985, contrary to prevailing custom that allows only men to inherit land, Wanjiku's grandfather left Wanjiku and her daughters a land inheritance. Her uncle was "furious" with the bequest and has allegedly disputed and encroached on Wanjiku's claim to the parcel since 1987. Wanjiku also asserted that land values in Kenya have been on the rise in recent years and implied that this trend may have animated her uncle's displeasure with her inheritance.

On April 14, 2016, Wanjiku's uncle called Wanjiku and stated that he wanted to sell her property. At her request, two of Wanjiku's daughters traveled in person to see if the uncle was in fact going to sell the land. When they arrived, however, Wanjiku's uncle "chased" them away. While Wanjiku's daughters

thereafter sought intercession by local elders, the uncle[2] interfered with those efforts, sending "gangs" to attack her daughters and threatening the sub-clan's chief.

Subsequent to those events, Wanjiku alleges that her uncle spread rumors that Wanjiku is (or has become) a lesbian and threatened Wanjiku's daughters with female genital mutilation ("FGM"). Wanjiku asserts that the increasing threats to lesbian, gay, bisexual and transgender ("LGBT") individuals in Kenya "give[] people like [her] uncle new cover and justification" for violence. Further, she claims that stigma will allow her uncle to "beat [] and possibly kill" her with impunity, if not with assistance from the police and community. Wanjiku specifically alleges that her uncle, aided by the rumors of her sexuality, has the influence to leverage the Mungiki warriors -- "a traditionalist, religious and political group" -- against her.

Wanjiku also alleges that she faces a risk of persecution based on her religion. In support, she cites the increasing violence by al-Shabaab, an East African Islamist insurgent group, against Kenyan Christians.

Wanjiku supported her motion to reopen with her own affidavit attesting to the above facts, evidence of her

---

[2] Some of the supporting documents regarding these incidents refer to threats by Wanjiku's "grandfather," rather than her uncle. Neither party addresses this disparity, nor do they attach any significance to that point.

grandfather's death and her uncle's status as "proprietor" of the Kenyan land, and documents evidencing the attacks against her daughters. Wanjiku also provided State Department and media reports on conditions in Kenya, including reporting on anti-LGBT rhetoric from powerful political and religious leaders, rising land prices which have caused sometimes violent disputes, and al-Shabaab's 2014 declaration that Kenya is a "war zone" and its role in a series of terrorist attacks.

On November 28, 2016, the IJ denied Wanjiku's motion to reopen. The IJ began by noting that Wanjiku's motion, filed more than three years after entry of the order of removal, was untimely. See 8 U.S.C. § 1229a(c)(7)(C)(i) (requiring motions to reopen to be filed within 90 days of removal order, subject to certain exceptions); 8 C.F.R. § 1003.2(c)(2) (same). The IJ then concluded that her motion and evidence failed to demonstrate changed country conditions which might excuse her non-compliance with that limitations period. 8 C.F.R. § 1003.2(c)(3)(ii). Instead, the IJ found that Wanjiku's motion was "predominantly based on changed personal circumstances" and failed to demonstrate any meaningful, relevant change in Kenya's country conditions. In particular, the IJ concluded that Wanjiku's evidence of climbing land prices (and resultant disputes), anti-LGBT discrimination, and al-Shabaab violence demonstrated a continuation of conditions already in

- 7 -

existence at the time of her prior hearing.[3]  The IJ further declined to reopen the proceedings sua sponte and denied the motion accordingly.

Wanjiku appealed the IJ's decision and, on May 15, 2017, the BIA issued a decision that affirmed the IJ's denial of the motion on discretionary grounds only without reaching the IJ's other findings.  Following appeal to this court, the Government made an unopposed motion to remand the case to the BIA to allow it to "more fully address all of the [IJ's] grounds for denying Wanjiku's motion."  On October 11, 2017, this court granted the Government's motion, vacated the May 15, 2017 BIA decision, and remanded for further proceedings.

On remand, the BIA again affirmed the IJ's denial of the motion to reopen.  It concluded that "the IJ did not reversibly err in finding [that] the [] country conditions" cited by Wanjiku "were examples of continuing conditions, rather than changed country conditions."  Though noting that Wanjiku's changed "personal circumstances may place her at increased risk of harm," the BIA concluded that this potential future harm remained "grounded in continuing country conditions, rather than material changed country conditions."  Accordingly, the BIA dismissed Wanjiku's appeal.

---

[3] The IJ relied on the same bases to conclude that Wanjiku failed to demonstrate a prima facie case for asylum relief.

**II.**

In her present appeal, Wanjiku argues that the agency's decisions erred in finding that conditions within Kenya had not changed since her prior hearing in 2013. Specifically, she argues that both the BIA and IJ overlooked two statements evidencing increased threats to LGBT persons and from al-Shabaab violence, and misconstrued her argument concerning violence resulting from land value increases.[4] Before delving into the details of those contentions, we begin by introducing the framework against which the agency's decision is evaluated and the standards we apply in undertaking that evaluation.

**A.**

As a general matter, motions to reopen immigration proceedings must be filed "within 90 days of the date of entry of a final administrative order of removal." 8 U.S.C.

_____

[4] Wanjiku previously argued that she was entitled to relief because changes in her personal circumstances that were outside of her control rendered certain country conditions newly relevant to her. In particular, she argued that her uncle's alleged spreading of rumors concerning her sexuality and threatening of FGM made discriminations along those lines pertinent to her case for the first time. Both the IJ and BIA considered and rejected these arguments, and Wanjiku does not on appeal press them again. Accordingly, these arguments are waived, and we do not further consider them here. See Silva v. Gonzales, 455 F.3d 26, 28 (1st Cir. 2006) ("We have held, with a regularity bordering on the monotonous, that litigants have an obligation to spell out their arguments squarely and distinctly, or else forever hold their peace." (internal quotation marks, alterations, and citation omitted)). Wanjiku also makes no argument as to the denial of sua sponte reopening.

§ 1229a(c)(7)(C)(i); see also 8 C.F.R. § 1003.2(c)(2). The time limit does not apply to motions to reopen in order to seek asylum or withholding of removal, however, if the relevant motion "is based on changed country conditions arising in the country of nationality or the country to which removal has been ordered, if such evidence is material and was not available and would not have been discovered or presented at the previous proceeding." 8 U.S.C. § 1229a(c)(7)(C)(ii); see also 8 C.F.R. § 1003.2(c)(3)(ii). "It is well-established that an applicant bears the burden of establishing changed country circumstances for purposes of § 1003.2(c)(3)(ii)," Larngar v. Holder, 562 F.3d 71, 76 (1st Cir. 2009), and must "make a convincing demonstration" of the claimed change, Xin Qiang Liu v. Lynch, 802 F.3d 69, 76 (1st Cir. 2015) (alteration omitted). Additionally, the petitioner's evidence "must, at a bare minimum, establish a prima facie case sufficient to ground a claim of eligibility for the underlying substantive relief."[5] Raza v. Gonzales, 484 F.3d 125, 128 (1st Cir. 2007).

In evaluating a motion to reopen based on changed country conditions, the BIA "compares the evidence of country conditions

---

[5] In an asylum claim, establishing a prima facie case requires the movant to "produce objective evidence showing a reasonable likelihood that he will face future persecution based on a statutory ground." Smith v. Holder, 627 F.3d 427, 437 (1st Cir. 2010) (quoting Larngar, 562 F.3d at 78) (internal quotation marks omitted). That is, persecution must be "on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42).

submitted with the motion to those that existed at the time of the merits hearing below." Haizem Liu v. Holder, 727 F.3d 53, 57 (1st Cir. 2013) (quoting In re S-Y-G-, 24 I. & N. Dec. 247, 253 (BIA 2007)) (internal quotation marks and alteration omitted). "Crucially, this evidence must demonstrate the intensification or deterioration of country conditions, not their mere continuation." Tawardrous v. Holder, 565 F.3d 35, 38 (1st Cir. 2009). "[G]rave conditions that remain grave do not equate to intensification of conditions," and thus will not sustain a motion to reopen. Sánchez-Romero v. Sessions, 865 F.3d 43, 46 (1st Cir. 2017).

"[T]he BIA enjoys considerable latitude in deciding whether to grant or deny [motions to reopen] . . . and we review the BIA's denial of a motion to reopen only for abuse of discretion." Jutus v. Holder, 723 F.3d 105, 109-10 (1st Cir. 2013) (internal quotation marks and citations omitted); see also Yong Xiu Lin v. Holder, 754 F.3d 9, 14 (1st Cir. 2014) (applying abuse of discretion review to denial of motion to reopen based on lack of changed country conditions). Under that standard, we uphold the BIA's decision "unless the petitioner can show that the BIA committed an error of law or exercised its judgment in an arbitrary, capricious, or irrational manner." Bbale v. Lynch, 840 F.3d 63, 66 (1st Cir. 2016). "When the BIA adopts the IJ's opinion and discusses some of the bases for the IJ's decision, we have authority to review both the IJ's and the BIA's opinions." Budiono

v. <u>Mukasey</u>, 548 F.3d 44, 48 (1st Cir. 2008) (internal quotation marks and citation omitted).

**B.**

Despite the uphill climb she faces in this review, Wanjiku purports to identify abuses of discretion with respect to the agency's review of each of her three alleged changed country conditions.  Specifically, she argues that the agency's decisions entirely overlooked two statements -- one by a prominent Kenyan politician equating homosexuality with "terrorism" and one by al-Shabaab designating Kenya as a "war zone" -- and misconstrued her evidence regarding "soaring" land values in Kenya.  On review, however, we see no abuse of discretion on any of these points.

Wanjiku's argument that the agency did not address (or, at least, adequately address[6]) the cited quotes fails at its inception.  This court's prior decisions make clear that

> [a]n agency is not required to dissect in minute detail every contention that a complaining party advances.  It is enough if the agency fairly considers the points raised by the complainant and articulates its decision in terms adequate to allow a reviewing court to conclude that the agency has thought about the evidence and the issues and reached a reasoned conclusion.

---

[6] While Wanjiku suggests at several points in her brief that the agency failed altogether to address either of the quotes, both the BIA and IJ decisions specifically cite each of those statements.

- 12 -

Raza, 484 F.3d at 128 (citations omitted).  Here, the IJ's and BIA's decisions clearly considered the relevant underlying arguments and simply concluded that the proffered evidence was not enough to show a real change of conditions.  The IJ's discussion of anti-LGBT activity -- subsequently endorsed by the BIA -- noted evidence in the record indicating that homosexuality has been illegal in that country since 1963 and discussed State Department reports which described pre-2013 violence, harassment, and arrests directed against Kenya's LGBT population.  Similarly, both discussions surveyed al-Shabaab's history of violence in Kenya, noting record evidence showing that the group's attacks began at least two years prior to Wanjiku's first hearing.  Those decisions found insufficient evidence to support Wanjiku's claim the group's activities had in fact escalated, its declaration of Kenya as a "war zone" notwithstanding.  Wanjiku points to no substantive fault with these observations, and her contention that the agency's analysis did not sufficiently emphasize her cited evidence is nothing more than "an objection to . . . factual determinations and the evidentiary weight . . . accorded to competing pieces of evidence," Xin Qiang Liu, 802 F.3d at 77.  We therefore discern no abuse of discretion based on this first set of challenges.

Wanjiku's challenge to the agency's evaluation of her land value-based challenge fares no better.  Both the BIA and IJ decisions cited specific evidence in the record to support their

shared conclusion that the admittedly dramatic increase in land prices pre-dated Wanjiku's initial hearing by at least three years. Wanjiku now claims that those orders "distorted the essence of [her] argument," which was that the rise in land prices only increased to the point of causing violence subsequent to her first hearing.  On appeal, however, she does not point to any portion of her motion below that squarely presented such an argument. Instead, she directs our attention to a 2014 news article in the record which discusses, in general terms, violence resulting from increased land prices "over the last few months."  However, that article also discusses violent land disputes going back as far as 1983, including a killing of 139 people arising from land disputes in 2012.  Even leaving aside whether that reference preserves or squarely presented her argument to the agency -- and we doubt that it does -- we could not conclude on the basis of this equivocal evidence that Wanjiku carried her burden of making a "convincing demonstration" that violence resulting from increased land value is a changed, rather than continuing, condition within Kenya.  Id. at 76.[7]

_____

[7] Wanjiku makes the further argument that evidence concerning rising land values was not "available" to her in 2013 within the meaning of Section 1229(a).  She reasons that, at that time, her uncle's threat to her land was not yet evident and so information regarding land values was not relevant to the prior proceeding. Because we conclude that her evidence does not demonstrate changed country conditions on that point, we need not further address whether the evidence was previously available to her.  Cf. Haizem

- 14 -

Accordingly, we find no abuse of discretion in the agency's finding that Wanjiku failed to establish changed country conditions. Because we find no abuse of discretion in the agency's evaluation of the country conditions, it is not necessary to further assess its conclusion that Wanjiku failed to make a prima facie case for asylum eligibility.[8]  See Haizem Liu, 727 F.3d at 58.

## III.

For the foregoing reasons, the petition is denied.

---

Liu, 727 F.3d at 56 (noting that evidence must both show changed country conditions and, "[a]dditionally," must have been "unavailable and undiscoverable at the time of the former hearing").

[8] Wanjiku raises the separate argument that even continuing country conditions may justify an asylum claim where the conditions "ripen" to relevance as to the applicant. In support of this argument, she points to the Ninth Circuit's decision in Fakhry v. Mukasey, 524 F.3d 1057 (9th Cir. 2008). However, that case considered an entirely separate statutory section, 8 U.S.C. § 1158(a)(2)(D), which extends the permissible time to seek asylum based on "the existence of changed conditions which materially affect the applicant's eligibility for asylum." In other words, the issue was whether the circumstances identified had any bearing on the merits of the applicant's underlying claim for asylum. See Fakhry, 524 F.3d at 1063. As noted, our finding that the agency did not abuse its discretion in concluding there were no changed circumstances obviates any need to examine Wanjiku's eligibility for asylum, and so we do not further consider this argument.