# United States Court of Appeals
## For the First Circuit

No. 17-2183

INDRA SIHOTANG,

Petitioner,

v.

JEFFERSON B. SESSIONS, III,
ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Thompson, Selya, and Kayatta,
Circuit Judges.

Jesse H. Thompson, with whom Andrea C. Kramer, Julie A.
Frohlich, and Kramer Frohlich LLC were on brief, for petitioner.
Abigail E. Leach, Trial Attorney, Office of Immigration
Litigation, U.S. Dept. of Justice, with whom Chad A. Readler,
Acting Assistant Attorney General, Civil Division, Anthony C.
Payne, Assistant Director, Office of Immigration Litigation, and
Janette L. Allen, Senior Litigation Counsel, Office of Immigration
Litigation, were on brief, for respondent.

August 15, 2018

**SELYA**, **Circuit Judge**.  Motions to reopen — especially untimely motions to reopen — are disfavored in immigration cases. Consequently, an alien who seeks to reopen removal proceedings out of time ordinarily faces a steep uphill climb.  This does not mean, though, that the mountaintop is entirely beyond reach.  The case at hand — in which the Board of Immigration Appeals (BIA) overlooked a significant factor relevant to the decisional calculus — illustrates the point.  After careful consideration of a tangled record, we grant the petition for judicial review, vacate the BIA's denial of the motion to reopen, and remand for further proceedings consistent with this opinion.

The petitioner, Indra Sihotang, is an Indonesian national and an evangelical Christian.  In his homeland, approximately eighty-seven percent of the population is Muslim.

The petitioner, then 36 years of age, entered the United States on a bogus crewmember's visa in 2003 and overstayed.  On March 26, 2004, federal authorities instituted removal proceedings against him pursuant to 8 U.S.C. § 1227(a)(1)(A).  After conceding removability, the petitioner cross-applied for asylum, withholding of removal, and protection under the United Nations Convention Against Torture (another form of withholding of removal).

During his November 2006 removal hearing before an immigration judge (IJ), the petitioner testified that he had experienced persecution in Indonesia on account of his faith.  He

described three sets of incidents, which he attributed to his religious identity:

- In 1992, the petitioner and his brother were assaulted while riding on a motor bike in Jakarta. They sustained serious injuries and received medical attention at a nearby hospital. The petitioner ascribed this assault to the Christian cross emblazoned on the T-shirt he was wearing.

- In 2002, Muslim extremists committed a series of high-profile attacks on Indonesian churches.

- Later that year, a group of Muslim extremists, using a megaphone, succeeded in disbanding a religious prayer meeting hosted by the petitioner at his home in Jakarta.

Despite the petitioner's testimony and his documentary submissions, the IJ denied the petitioner's application for relief, but granted him a two-month voluntary departure window "for humanitarian reasons." The BIA dismissed the petitioner's appeal on May 14, 2008. The petitioner did not seek judicial review of that dismissal.

Notwithstanding the expiration of the voluntary departure period, federal authorities allowed the petitioner to remain in the United States under an order of supervision for

almost ten years.[1]  During that interval, the petitioner married an Indonesian Christian with ethnic Chinese heritage (an ethnicity strongly associated with Christianity in Indonesia).  They have four American-born children, one of whom has Down syndrome.  The petitioner abided by the terms of his supervision, worked regularly, and was the family's sole source of income.  In addition, he provided his disabled son with daily physical therapy.

The world turned upside-down for the petitioner and his family on September 7, 2017.  At that time, the petitioner went to an ICE field office in New York for the purpose of renewing his supervision paperwork (as he had done on several prior occasions).  This time, he was taken into custody by ICE officers.

On October 12, 2017 — while still in custody — the petitioner moved to reopen his removal proceedings.  See 8 C.F.R. § 1003.2(c).  Because the petitioner's motion was not filed within 90 days of the final administrative decision in the initial removal proceeding, the BIA deemed the motion time-barred.  See id. § 1003.2(c)(2).  Seeking to avoid this temporal barrier, the petitioner averred that country conditions in Indonesia had

---

[1] This order of supervision arose out of Operation Indonesian Surrender, a humanitarian program initiated by Immigration and Customs Enforcement (ICE).  Under the program, Indonesian nationals subject to final orders of removal could make themselves known to ICE and, in ICE's discretion, receive temporary stays of removal, accompanied by renewable orders of supervision.  See Devitri v. Cronen, 289 F. Supp. 3d 287, 290 (D. Mass. 2018).

changed materially since the time of his merits hearing. See id. § 1003.2(c)(3)(ii). In support, he submitted new evidence in the form of published news articles and country conditions reports. He also submitted a detailed 66-page affidavit signed by Dr. Jeffrey A. Winters, an academician specializing in Indonesian political economy, labor, and human rights.

The BIA gave the petitioner short shrift. In a terse one-and-a-half page opinion, the BIA framed the petitioner's claim as one of "changed country conditions affecting Indonesian Christians, particularly in the increasing influence of extreme Islamic groups." It proceeded to deny the petitioner's motion to reopen, concluding that conditions in Indonesia had not "materially changed since [the 2006 merits] hearing." In the BIA's estimation, the petitioner had managed to show only "a continuation of previously existing conditions." Although the BIA concluded that "Christians in Indonesia may face societal abuses or discrimination, and . . . there have been incidents of harm against Christians and their places of worship," it nonetheless noted that, "millions of Christians continue to live in Indonesia without experiencing harm." This timely petition for judicial review ensued. We issued a temporary stay of removal on December 1, 2017, and supplanted that temporary stay with a more durable stay order on February 14, 2018.

- 5 -

Our standard of review is familiar. Motions to reopen removal proceedings are disfavored because they impinge upon "the compelling public interests in finality and the expeditious processing of proceedings." Bbale v. Lynch, 840 F.3d 63, 66 (1st Cir. 2016) (quoting Roberts v. Gonzales, 422 F.3d 33, 35 (1st Cir. 2005)). We afford the BIA "wide latitude in deciding whether to grant or deny such a motion," id., and judicial review is for abuse of discretion, see Sánchez-Romero v. Sessions, 865 F.3d 43, 46 (1st Cir. 2017). To cross this threshold, the petitioner must show that the BIA either "committed an error of law or exercised its judgment in an arbitrary, capricious, or irrational manner." Bbale, 840 F.3d at 66.

Whether an abuse of discretion occurs necessarily hinges on the facts and circumstances of each particular case. To guide this inquiry, we have explained that the BIA may abuse its discretion "by neglecting to consider a significant factor that appropriately bears on the discretionary decision, by attaching weight to a factor that does not appropriately bear on the decision, or by assaying all the proper factors and no improper ones, but nonetheless making a clear judgmental error in weighing them." Murillo-Robles v. Lynch, 839 F.3d 88, 91 (1st Cir. 2016) (quoting Henry v. INS, 74 F.3d 1, 4 (1st Cir. 1996)).

With the standard of review in place, we return to the case at hand. To succeed on his motion to reopen, the petitioner

had to satisfy two substantive requirements.  First, he had to "introduce new, material evidence that was not available at the original merits hearing."  Perez v. Holder, 740 F.3d 57, 62 (1st Cir. 2014).  Second, he had to "make out 'a prima facie case of eligibility for the relief sought.'"  Id. (quoting Jutus v. Holder, 723 F.3d 105, 110 (1st Cir. 2013)).

In determining whether the petitioner satisfied the first requirement, the BIA had to "compare[] the evidence of country conditions submitted with the motion to those that existed at the time of the merits hearing."  Sánchez-Romero, 865 F.3d at 46 (quoting Xin Qiang Liu v. Lynch, 802 F.3d 69, 76 (1st Cir. 2015)).  To prevail, the petitioner had to demonstrate that conditions in Indonesia had "intensified or deteriorated" in some material way between November 8, 2006 (the date of the petitioner's merits hearing) and October 12, 2017 (the date on which the petitioner filed his motion to reopen).  Id.  The BIA concluded that the petitioner failed to satisfy this requirement:  he had shown nothing more than the persistence of negative conditions for Indonesian Christians.  That showing, the BIA opined, was insufficient to carry the petitioner's burden of proving that his new evidence reflected a material change in country conditions.[2]

_____

[2] The BIA did not analyze the second requirement.  Had it done so, it would have had to determine whether the petitioner had made a prima facie showing of the substantive elements of the relief

- 7 -

See, e.g., Sugiarto v. Holder, 761 F.3d 102, 103-04 (1st Cir. 2014); Simarmata v. Holder, 752 F.3d 79, 81 (1st Cir. 2014); Marsadu v. Holder, 748 F.3d 55, 59 (1st Cir. 2014); Fen Tjong Lie v. Holder, 729 F.3d 28, 30-31 (1st Cir. 2013).

We find the BIA's analysis superficial. For aught that appears, the BIA seems to have evaluated the petitioner's motion to reopen as if he were a prototypical Indonesian Christian. The record, however, belies this assumption. In his motion to reopen, the petitioner asserted — and the government did not dispute — that the petitioner subscribes to a more particularized subset of the Christian faith: he is an evangelical Christian, for whom public proselytizing is a religious obligation. Yet, in terms of the prospect of persecution arising out of changed country conditions, the BIA wholly failed to evaluate whether and to what extent there is a meaningful distinction between Christians who practice their faith in private and evangelical Christians (such as the petitioner), for whom public proselytizing is a central tenet. So, too, the BIA neglected to consider whether country conditions had materially changed with respect to public and private reactions (including vigilante violence) toward evangelical Christians. Finally, the BIA neglected to consider

ultimately sought (here, asylum or withholding of removal). See Panoto v. Holder, 770 F.3d 43, 46 (1st Cir. 2014).

- 8 -

whether attitudes in Indonesia had materially changed with respect to persons making public religious statements.

While it remains true that the BIA need not "dissect in minute detail every contention that a complaining party advances," Xiao He Chen v. Lynch, 825 F.3d 83, 88 (1st Cir. 2016) (quoting Raza v. Gonzales, 484 F.3d 125, 128 (1st Cir. 2007)), it cannot turn a blind eye to salient facts. The BIA must fairly appraise the record and, in this case, it appears to have completely overlooked critical evidence. Indeed, the BIA never even mentioned terms remotely resembling "evangelical" or "proselytize" in its opinion. So stark a failure to consider significant facts that appropriately bear on the discretionary decision about whether to grant a motion to reopen is perforce an abuse of discretion. See Murillo-Robles, 839 F.3d at 91; Henry, 74 F.3d at 4.

Nor can we say either that these overlooked facts were insignificant or that the BIA's error in disregarding them was harmless. The record is replete with copious new evidence submitted by the petitioner and unavailable in 2006, which might well serve to ground a finding (or at least a reasonable inference) that country conditions have steadily deteriorated over the past twelve years. In particular, Islamic fundamentalist fervor seems to have intensified, such that evangelical Christians may now be at special risk in Indonesia. We offer some examples of this evidence:

- Media reports suggest that Indonesia has been moving inexorably away from secular values and toward sharia law. For instance, the national government codified and enacted sharia principles into criminal, economic, and moral legislation in 2008.

- That same year, Muslim extremists stormed the Arastamar Evangelical School of Theology in the middle of the night, wielding spears and hurling Molotov cocktails. Eighteen students were seriously injured.

- In 2010, Muslim extremists tried to prevent thousands of Christians from gathering for Easter mass; the local government responded by supporting the extremists and instructing the worshippers to forgo the service.

- Five months later, a pair of marauders beat and stabbed two Christian clergymen in broad daylight. The assailants were found guilty only of "unpleasant conduct" and sentenced to a few months in jail.

- In early 2011, more than 1,500 Muslim extremists violently demanded the death sentence for a

Christian found guilty of blasphemy. When he received the statutory maximum prison sentence but was allowed to live, extremists stormed the courthouse and burned three churches to the ground.

- In 2013, the national government introduced a bill to broaden the definition of criminal blasphemy (which was already "implemented almost exclusively in defense of Islam") and increase the maximum sentence thereunder.

- In 2016, several hundred thousand Indonesians protested vociferously after the governor of Jakarta (a Christian) publicly encouraged Indonesians to consider voting for non-Muslims. The authorities lost no time in charging the governor with violating a blasphemy law that rarely had been invoked during the previous three decades. The governor was convicted and sentenced to a two-year prison term.

- Also in 2016, government officials publicly caned a Christian. This broke new ground: it was one of the first impositions of sharia punishment on a non-Muslim.

- Later that year, Indonesia's highest Islamic council modified a fatwa (religious ban) so that it

prohibited Muslims from saying "Merry Christmas" or wearing "non-Muslim religious attributes" (including Santa hats and reindeer horns) in stores and restaurants.[3] Hardline vigilante groups — sometimes accompanied by Indonesian police — "swept" through areas where suspected violations of this fatwa were reported.

- Dr. Winters' affidavit indicates that since 2008, "violence and intolerance directed at religious minorities has increased at a shocking rate," while the "government [has remained] unwilling or unable to take firm and decisive action to punish militant Muslims." Among other supporting items, Dr. Winters cites a 2017 study finding that "the frequency of [vigilante] mob attacks actually registered a 25 percent increase between 2007 and 2014."

- With respect to evangelical Christians, Dr. Winters stated that they "face heightened risks because a core part of their faith and practice is to go out into their communities and 'spread the Gospel,'

_____

[3] Prior to 2016, this fatwa — originally issued in 1981 — explicitly allowed Muslims to say "Merry Christmas" and only proscribed Muslim participation in formal Christian rituals (such as prayer and mass).

which in Indonesia is deemed to be hostile proselytizing that leads to [illegal] religious conversion."

- Dr. Winters also pointed out that "[t]he Islamic movement to impose exclusionary shari[a] law has grown stronger and more radical" since 2008. This fact, along with the totality of the other relevant circumstances, led him to conclude that "[t]he danger to [the petitioner] as an evangelical Christian is vastly higher now than it was at the end of 2008."

There is more. The petitioner buttressed the evidentiary submissions accompanying his motion to reopen with country conditions reports. We previously have noted that State Department country conditions reports, though not conclusive, are "generally deemed authoritative for purposes of immigration proceedings." Pulisir v. Mukasey, 524 F.3d 302, 310 (1st Cir. 2008). In this case, the country conditions reports made pellucid that religious intolerance was a burgeoning problem. To compound the problem, the Indonesian government — both at the national and local levels — has, according to the reports, increasingly "failed to prevent violence, abuse, and discrimination against individuals based on their religious belief[s]."

- 13 -

We add, moreover, that the reports identified another area of growing concern: the authorities "discriminated against followers of religious groups that constituted a local minority" through arbitrary arrests and charges for blasphemy and insulting religion. And even though proselytizing and other attempts at religious conversion were criminalized in Indonesia prior to 2006, the reports noted a dramatic increase from that time forward in persecution (both by the government and by private parties) of Indonesians who publicly display their Christianity.

To be sure, the government tries to pigeonhole the petitioner's case as merely another link in a chain of four cases in which we have rejected claims by Indonesian Christians that country conditions have materially changed. See Sugiarto, 761 F.3d at 104; Simarmata, 752 F.3d at 82; Marsadu, 748 F.3d at 61; Fen Tjong Lie, 729 F.3d at 31. This case, though, is readily distinguishable. None of the earlier cases involved an alien who held himself out to be an evangelical Christian. Accordingly, the religious beliefs of those aliens — and therefore their experiences with religious intolerance — were different in kind, not just in degree.

What is more, the factual inquiry in this case covers a span (approximately eleven years) that is considerably longer than the span considered in any of our earlier cases. We think it is plain that the longer the time span, the more inclusive the factual

inquiry into whether country conditions have changed. Here, this more inclusive factual inquiry reflects a steep rise in intolerance from start to finish.

To cinch matters, this case is of more recent vintage than any of the cases relied on by the government. This fact is critically important because the record details an especially sharp increase in governmental and private persecution of Indonesian Christians between 2014 and 2017 — a period not under review in any of those prior cases.

The short of it is that the record reflects a ramping-up of religious intolerance, increasing over time, in ways that a reasonable observer might find uniquely problematic for evangelical Christians. This evidence of steadily deteriorating country conditions raises a troubling question as to whether a tipping point — a point at which the changes can be said to be materially adverse to evangelical Christians — has been reached. The BIA should have confronted this question face up and squarely and provided a reasoned answer to it. Specifically, it should have considered whether, in view of the public nature of the petitioner's evangelical faith, country conditions in Indonesia had materially changed. Its failure to do so constituted an abuse of discretion and undermined its denial of the motion to reopen.

We need go no further. At this juncture, it would be premature for us to attempt to make a definitive determination

either as to whether the petitioner has established materially changed country conditions vis-à-vis evangelical Christians or as to whether he has made a prima facie showing of eligibility for the relief ultimately sought. See Bbale, 840 F.3d at 66. It suffices for us to hold — as we do — that the BIA abused its discretion in neglecting to consider significant facts that may have had a bearing on the validity of the petitioner's motion to reopen.

For the reasons elucidated above, we grant the petition for judicial review, vacate the order of the BIA, and remand so that the BIA may determine, upon due consideration of all the relevant evidence, whether the petitioner has shown a material change in country conditions and, if so, whether he has made a prima facie showing of eligibility for the relief ultimately sought. The stay of removal entered by this court on February 14, 2018, will remain in effect pending further order of this court. We retain jurisdiction to the extent necessary to extend, modify, dissolve, or ensure compliance with that stay order.

**So ordered.**