**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| HENRI NABABAN; HARLENA ROSE SILALAHI, *Petitioners,* v. MERRICK B. GARLAND, Attorney General, *Respondent.* | No. 18-72548 Agency Nos. A078-020-176 A096-349-826 OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 13, 2021
Pasadena, California

Filed November 23, 2021

Before:  Richard A. Paez and Lawrence VanDyke, Circuit
Judges, and Sharon L. Gleason,[*] District Judge.

Opinion by Judge Gleason;
Dissent by Judge VanDyke

---

   [*] The Honorable Sharon L. Gleason, United States District Judge for the District of Alaska, sitting by designation.

## SUMMARY[**]

### Immigration

Granting Henri Nababan and Harlena Rose Silalahi's petition for review of an order of the Board of Immigration Appeals denying their second motion to reopen their applications for asylum, withholding of removal, and relief under the Convention Against Torture, vacating the order of removal, and remanding, the panel held that the Board erred by failing to assess Petitioners' individualized risk of persecution in Indonesia due to their identity as evangelical Christians.

The panel explained that the Board correctly recognized that Christians in Indonesia are a disfavored group, but it failed to account for Petitioners' status as evangelical Christians or the evidence they presented indicating that evangelical Christians have experienced a particular increase in violence and persecution, beyond that experienced by Indonesian Christians in general.

The panel remanded for the Board to assess whether country conditions in Indonesia have materially changed for evangelical Christians in particular, as distinct from Christians in general. Moreover, the panel instructed that if the Board finds materially changed country conditions, it should consider the impact of Petitioners' recent leadership roles in their church, which the Board previously characterized as changes in personal circumstances, and determine whether Petitioners have established prima facie

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

eligibility for asylum, withholding of removal, and CAT relief.

Dissenting, Judge VanDyke wrote that the majority remands to the Board due to the Board's purported failure to assess Petitioners' individualized risk as "evangelical Christians" within the broader group of Indonesian Christians generally, but in doing so, clings to a myopic focus on the phrase "evangelical Christians," which the record reveals is at most mere semantics and a misrepresentation of the Board's decision. Judge VanDyke wrote that simply because the Board did not ritualistically chant the precise phrase "evangelical Christians" in its decision cannot be a reason to ignore that the Board appropriately considered the particular risk that Petitioners might face as Christians who evangelize. Moreover, Judge VanDyke wrote that the majority relies on an expert affidavit that fails to provide any evidence or analysis showing that "evangelical Christians" are treated any differently in Indonesia than Christians generally—or, for that matter, all religious minorities. Judge VanDyke explained that once one strips away the majority's magic-word requirement, what's left is the question of whether Petitioners have shown enough of a change in country conditions to surmount the high bar for reopening. Judge VanDyke wrote that the Board addressed this exact question, in such a way that not even the majority can pretend is wrong without inventing some undefined group the Board supposedly failed to consider.

**COUNSEL**

Howard R. Davis (argued), Law Office of Howard R. Davis, Glendale, California, for Petitioner.

Remi da Rocha-Afodu (argued), Trial Attorney; Mary Jane Cadaux, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

GLEASON, District Judge:

Henri Nababan and Harlena Rose Silalahi (Petitioners) petition for review of an order of the Board of Immigration Appeals (BIA) denying their second motion to reopen their applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT). Exercising jurisdiction under 8 U.S.C. § 1252(a)(1), we grant the petition for review, vacate the orders of removal, and remand for further proceedings consistent with this opinion.

**I**

Petitioners are Indonesian nationals and members of the Seventh Day Adventist (SDA) Church. Nababan was admitted to the United States in December 1999 on a temporary nonimmigration visa. He remained in the country beyond the authorized time period without permission. Silalahi was admitted to the United States in February 2002 on a temporary nonimmigrant visa and also remained beyond the authorized period without permission. Petitioners married each other in 2003.

In 2003, Petitioners were each served a Notice to Appear and charged with removability under 8 U.S.C. § 1182(a)(6)(A)(i). Petitioners conceded removability and sought relief in the forms of asylum, withholding of removal, and claims under the CAT. Petitioners principally claimed fear of persecution and torture in Indonesia on account of their SDA faith. Silalahi testified that she had not been allowed to spread the word of her faith when she had resided in Indonesia and would be unable to safely spread the word of her religion if she returned to Indonesia. Nababan testified that he was a deacon in the SDA, with the responsibilities of cleaning the church, visiting ill members, and participating in spreading the Gospel.

On April 1, 2009, the IJ issued an oral decision denying Petitioners' applications and ordering them removed to Indonesia. The IJ denied Silalahi's application for asylum because she had "failed to establish past persecution [or] the likelihood of future persecution." The IJ acknowledged that Petitioners were members of a disfavored group in Indonesia as Christians but ruled that they had not demonstrated that their fear of harm was distinct from that of any other Christians in Indonesia. Additionally, the IJ denied both Petitioners relief under the CAT because they did not prove that it was more likely than not that they would face torture in Indonesia.

The BIA dismissed Petitioners' timely appeal on April 30, 2010. With regard to the withholding of removal claims, the BIA found that the incidents of harassment and discrimination experienced by Petitioners in Indonesia did not constitute past persecution. The BIA also found that Petitioners did not establish a "well-founded fear of future persecution," stating that the record evidence did "not document widespread mistreatment of Christians"; rather,

the evidence demonstrated sporadic incidents against Christians that were limited to specific parts of Indonesia. Additionally, the BIA assumed that Petitioners were members of a disfavored group but nonetheless concluded that "they have not established that they face a 'unique risk of persecution' that is 'distinct from [their] mere membership in a disfavored group.'" Because Petitioners failed to submit evidence of individualized harm, the BIA found they were not eligible for asylum or withholding of removal under the disfavored group analysis. The BIA also rejected Petitioners' CAT claims.

Petitioners then sought review from this court. The court denied the petition in September 2012. *Nababan v. Holder*, 479 F. App'x 118 (9th Cir. 2012) (unpublished). The court held that substantial evidence supported the BIA's conclusions that "petitioners did not establish their experiences in Indonesia rose to the level of persecution" and that, "even under a disfavored group analysis, petitioners ha[d] not demonstrated sufficient individualized risk of persecution to establish eligibility for asylum or withholding of removal." *Id.* at *1. The court also held that substantial evidence supported the BIA's rejection of Petitioners' CAT claims. *Id.*

On November 21, 2012, Petitioners filed their first motion to reopen to reapply for asylum, withholding of removal, and protection under the CAT based on changed country conditions in Indonesia. Petitioners claimed that "[a]nti-Christian sentiment ha[d] increased in the recent months." Petitioners also submitted evidence of continuing religious intolerance and evidence that Indonesian government authorities had not always responded to such incidents.

The BIA determined that Petitioners' motion was untimely, then evaluated whether Petitioners' claims fell within the only applicable exception to the timeliness requirement: changed country conditions. Comparing the evidence of Indonesia's conditions submitted with the motion to those that existed at the time of Petitioners' April 2009 removal hearing, the BIA concluded that Petitioners had not met their "heavy burden" to demonstrate a material change in country conditions. The BIA found that "violence against Christians in Indonesia is neither systemic nor pervasive, but has continued sporadically over the years" and that "while Christians are a 'disfavored group' in Indonesia, . . . the respondents have not offered evidence showing that they face an individualized risk of future persecution on account of their religion so as to distinguish their risk of persecution from the generalized risk felt by all Christians in Indonesia." Accordingly, the BIA denied Petitioners' untimely motion.[1]

Petitioners then again sought review from this court, and we again denied review. *Nababan v. Lynch*, 660 F. App'x 524 (9th Cir. 2016) (unpublished). The court held that the "BIA did not abuse its discretion in finding that Petitioners failed to establish materially changed circumstances in Indonesia to qualify for an exception to the time limitations for a motion to reopen." *Id.* at 525. As the court explained, "[t]he BIA recognized that religious intolerance in Indonesia is on-going" but nonetheless "concluded that the violence against Christians was neither systemic nor pervasive." *Id.*

---

[1] The BIA did not address Petitioners' CAT claims. It appears that Petitioners did not appreciably raise the CAT claims in their first motion to reopen.

On January 2, 2018, Petitioners filed their second motion to reopen, which is the subject of this petition.  Petitioners sought to reapply for asylum, withholding of removal, and CAT protection based on "changed country conditions in Indonesia that materially affect their new leadership roles in the Seventh Day Adventist Church."  Petitioners asserted that there had been an "eruption of attacks against Christians as a whole starting in 2016."  Petitioners stressed that they practiced evangelical Christianity, in which a key tenet of their faith is spreading the Gospel, and noted the heightened danger they would face if they were to proselytize in Indonesia.  Petitioners also explained that, in addition to being a deacon in the church, Nababan had been chosen as a church elder for the 2018–2019 year, and Silalahi had been chosen as a deaconess for the 2018–2019 year in addition to her continued work as a Sabbath schoolteacher and church pianist.  Petitioners contended that their new leadership positions in the SDA would place them in greater danger in light of Indonesia's recent "rigorous enforcement of anti-blasphemy legislation against evangelical Christians" and "an increase in violence against Christian evangelicals perpetrated by Muslim radicals and hardline Islamic groups, whom the Indonesian government supports or fails to suppress."  Petitioners provided a letter from Silalahi's father, an SDA member in Indonesia, who explained that he had been recently beaten, kicked, and spit on for proselytizing to a Muslim.  Petitioners also provided evidence that the front door of an SDA church had been intentionally burnt down in February 2017 and of protests in late 2016 sparked by a Christian politician's alleged blasphemy of the Koran.  After the protests, the Christian politician—popularly known as Ahok—was prosecuted under Indonesia's blasphemy laws and sentenced to two years' imprisonment.  Petitioners further submitted several

news articles and reports that discussed religious intolerance in Indonesia.

Petitioners included an affidavit from Jeffrey A. Winters, Ph.D, an expert in the society, economy, and politics of Indonesia.  Dr. Winters explained that "radical Islam has gained significantly in strength in Indonesia since the end of 2012, and [] from that date forward the level of violence and intolerance directed at religious minorities has increased at a shocking rate."  He acknowledged that all non-Muslims are under threat in Indonesia as intolerance grows and violence against religious minorities becomes more widespread. Since Petitioners are evangelical Christians, however, he opined that they are at a particularly heightened risk of such violence "because a core part of their faith and practice is to go out into their communities and 'spread the Gospel,' which in Indonesia is deemed to be predatory proselytizing." Another expert, Professor Mark Cammack, J.D., stressed the heightened risk of vigilante violence that Petitioners would face if they were compelled to return to Indonesia and engaged in evangelism in accordance with their beliefs.[2]

---

[2] Notwithstanding these expert affidavits and the other evidence, the dissent asserts that Petitioners have not "provided a stitch of evidence in support of Petitioners' motion to reopen evincing that 'evangelical Christians' as a separate group are exposed to a higher risk of persecution in Indonesia than Christians in general."  Although the experts' opinions are compelling, it is also self-evident that if all minority religions are at risk in Indonesia, then those that proselytize by seeking to convert others to their beliefs are inherently at greater risk than those Christians and other minority religious believers who practice their beliefs in private. As the First Circuit noted in *Sihotang v. Sessions*, here too "the record reflects a ramping-up of religious intolerance, increasing over time, in ways that a reasonable observer might find uniquely problematic for evangelical Christians."  900 F.3d 46, 51, 53 (1st Cir. 2018) ("In

The BIA denied Petitioners' motion on August 28, 2018. The BIA first summarized Petitioners' claims, noting that they were active members and leaders in the SDA Church and that a tenet of the SDA Church is to spread the Gospel. The BIA then compared Petitioners' evidence of country conditions submitted with the most recent motion to the conditions at the time of the 2009 removal hearing. The BIA stated that the 2009 evidence "reveals that the Indonesia Government generally respected religious freedom, and Protestantism received official recognition." However, the BIA had recognized in 2009 that the "Indonesian Government sometimes failed to protect persons from discrimination and abuse based on religion" and that Christian Indonesians were considered a disfavored group prior to the 2009 hearing. The BIA then recounted Petitioners' current evidence, including "evidence of attacks against Christian churches, including an SDA church"; the affidavits from Petitioners' two experts; and the letter from Ms. Silalahi's father, describing his beating in 2017 for providing a Bible and religious instruction to a Muslim. The BIA noted that much of Petitioners' current evidence related to "the events leading up to and following demonstrations in 2016 in Jakarta that were instigated by Muslim radicals following blasphemy charges against [the] popular Christian politician [Ahok]."

After identifying Petitioners' evidence, the BIA determined that Petitioners' "recent leadership roles in their church are changes in their personal circumstances rather than a change in circumstances or conditions in Indonesia." In comparing the conditions at the time of the 2009 removal hearing with those at the time of the most recent motion—

particular, Islamic fundamentalist fervor seems to have intensified, such that evangelical Christians may now be at special risk in Indonesia.").

filed in 2018—the BIA found that Christians in Indonesia continue to be a "disfavored group" but that Petitioners' new evidence did "not reflect materially changed conditions affecting [their] 'individualized risk' of persecution to warrant reopening." In its analysis, the BIA did not consider whether the fact that Petitioners are evangelical Christians places them at increased risk of persecution as compared to other Christians.

The BIA ultimately determined that Petitioners "have not met their 'heavy burden' required for reopening under the 'changed country conditions exception' to the filing restrictions." Rather, the BIA held that Petitioners had only offered "media articles and statements reflecting difficulties faced by Christians in Indonesia." The BIA further stated that Petitioners "have not shown that they are similarly situated to the well-known politician [Ahok] who was subjected to blasphemy charges." Lastly, the BIA declined to exercise its limited sua sponte authority to reopen the proceedings. Accordingly, the BIA denied Petitioners' motion to reopen. This timely petition for review followed.

## II

The Court reviews the BIA's denial of a motion to reopen for abuse of discretion. *Najmabadi v. Holder*, 597 F.3d 983, 986 (9th Cir. 2010). The BIA abuses its discretion when its decision is arbitrary, irrational or contrary to law. *Id.* We review the BIA's determination of purely legal questions de novo and the BIA's factual findings for substantial evidence. *Gonzalez-Caraveo v. Sessions*, 882 F.3d 885, 889, 895 (9th Cir. 2018). The BIA "must show proper consideration of all factors." *Bhasin v. Gonzales*, 423 F.3d 977, 983 (9th Cir. 2005). The BIA "commit[s] legal error when it fail[s] to analyze [a petitioner's] individualized threat of persecution" as part of

a disfavored group.  *Salim v. Lynch*, 831 F.3d 1133, 1140 (9th Cir. 2016).

### III

Generally, a party wishing to file a motion to reopen must do so within ninety days.  8 C.F.R. § 1003.2(c)(2).  However, the ninety-day time limit does not apply when the motion to reopen is "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered, if such evidence is material and was not available and could not have been discovered or presented at the previous hearing."  *Id.* § 1003.2(c)(3)(ii).

The BIA correctly recognized that Christians in Indonesia are a disfavored group.  *See Tampubolon v. Holder*, 610 F. 3d 1056, 1058 (9th Cir. 2010).  It failed, however, to account for Petitioners' status as *evangelical* Christians or the evidence they presented indicating that evangelical Christians have experienced a particular increase in violence and persecution, beyond that experienced by Indonesian Christians in general.   In recounting the evidence Petitioners submitted with their motion to reopen, the BIA did note that Petitioners were members of the SDA Church, in which a key tenet of their faith is spreading the Gospel.  But that appears to be the full extent of the BIA's consideration of Petitioners' evangelical faith.   The BIA's analysis repeatedly described the disfavored group at issue as the broader group of "Christians in Indonesia."   For example, the BIA cited our court's precedent to explain that "prior to [Petitioners'] removal hearing, Christian Indonesians were determined to be members of a 'disfavored group.'"  *See Sael v. Ashcroft*, 386 F.3d 922, 927 (9th Cir. 2004).  Moreover, despite Petitioners' repeated references to "evangelical Christians" and proselytizing activities in their motion, the BIA did not

use those terms. Accordingly, while the BIA obliquely recognized Petitioners' evangelical faith and activities in its summary of Petitioners' claims, its analysis failed to give Petitioners' evangelical faith "proper consideration." *Bhasin*, 423 F.3d at 983.

We note that other circuits have recognized that the BIA should consider the unique risks faced by evangelical Christians and Christians who publicly proselytize as distinct from Christians in Indonesia as a general group.[3] In *Sihotang*, the First Circuit explained that its prior decisions rejecting claims of changed country conditions for Christians in Indonesia did not dictate the same result for evangelical Christians, because their "religious beliefs . . . and therefore their experiences with religious intolerance [] were different in kind, not just in degree." 900 F.3d at 53. The court noted that the record "reflected[ed] a ramping-up of religious intolerance . . . that a reasonable observer might find uniquely problematic for evangelical Christians" due to the "public nature" of their faith. *Id.* Similarly, the Third Circuit cited to *Sihotang* in *Liem v. Attorney General*, explaining that an "increase in religious intolerance in Indonesia" could be especially problematic for the petitioner because as a minister in his community, he was practicing his Christian faith publicly. 921 F.3d 388, 400 (3d Cir. 2019). Both the First and Third Circuits granted the petitions for review and remanded to the BIA for proper consideration

---

[3] The dissent questions the ability of immigration courts or the BIA to determine when a petitioner is an "evangelical Christian, for whom public proselytizing is a religious obligation." *Sihotang*, 900 F.3d at 50. We do not believe that such identification presents a problem in this case. Petitioners are members of a well-known evangelical church; have submitted a letter from Ms. Silalahi's father concerning an attack stemming from proselytizing; and have professed their belief in spreading their faith to non-Christians.

of the evidence concerning changed conditions for evangelical Christians and Christians who practice their faith publicly. *Sihotang*, 900 F.3d at 53; *Liem*, 921 F.3d at 401.

The dissent contends that the majority "faults the BIA for not addressing something [i.e., Petitioners' evangelical faith] that was never actually presented to the BIA[.]" But that "something" was clearly presented to the BIA in Petitioners' motion to reopen. Petitioners moved to reopen principally on the basis that they faced a unique risk of persecution as evangelical Christians for whom proselytizing is a religious obligation, distinct from the larger disfavored group of Christians in Indonesia.

For the aforementioned reasons, we hold that the BIA committed legal error because it did not assess the individualized risk of persecution that Petitioners face due to their identity as evangelical Christians. Accordingly, we grant the petition for review and remand to the BIA. On remand, the BIA should assess whether country conditions in Indonesia have materially changed for evangelical Christians in particular, as distinct from Christians in general. If the BIA finds materially changed country conditions, the BIA should consider the impact of Petitioners' recent leadership roles in their church, which the BIA previously characterized as changes in personal circumstances, *see Rodriguez v. Garland*, 990 F.3d 1205, 1210–11 (9th Cir. 2021) ("Changes in a petitioner's personal circumstances are only relevant where those changes are related to the changed country conditions that form the basis for the motion to reopen."), and determine whether Petitioners have established prima facie eligibility for asylum, withholding of removal, and relief under the CAT, *see Agonafer v. Sessions*, 859 F.3d 1198, 1204 (9th Cir. 2017).

**PETITION FOR REVIEW GRANTED, ORDERS OF REMOVAL VACATED, AND REMANDED FOR FURTHER PROCEEDINGS.**

VANDYKE, Circuit Judge, dissenting:

Our circuit's immigration jurisprudence is a perpetually embarrassing illustration of how tough it is for judges to keep to our proper role, which Congress has narrowly circumscribed, tasking us with monitoring an area of law mostly assigned to the executive branch of government. The majority's unwarranted reversal in this case is the latest specimen of our playing BIA-for-a-day instead of genuinely deferring to the agency's decisions.

Often, I'm baffled why my colleagues strain to prevent removal in some of the cases that come before us, particularly where the petitioners have a disturbing criminal history.[1] But in this case, it's easy to see why one would

---

[1] *See, e.g.*, *Afanador v. Garland*, 11 F.4th 985, 988, 998 (9th Cir. 2021) (remanding for consideration of additional evidence from the parties for a petitioner who had numerous arrests and convictions, including two indecent exposure convictions); *Agonafer v. Sessions*, 859 F.3d 1198, 1201 n.1, 1206–07 (9th Cir. 2017) (remanding for consideration of changed conditions for a petitioner who committed sexual battery and lewd acts with a minor); *Morales v. Gonzales*, 478 F.3d 972, 978, 984 (9th Cir. 2007), *abrogated on other grounds by Anaya-Ortiz v. Holder*, 594 F.3d 673, 677–78 (9th Cir. 2010) (remanding for CAT relief determination for petitioner who communicated sexually with minors); *Avila-Arias v. Garland*, 847 F. App'x 468, 472–73 (9th Cir. 2021) (VanDyke, J., dissenting) (highlighting the need for deference to the agency regarding its CAT determination because substantial evidence supported the determination that the petitioner—who fractured

want to help Petitioners Henri Nababan and Harlena Rose Silalahi. They present a sympathetic case for asylum, as Judge Pregerson lamented in one of their earlier unsuccessful trips to our court. *See Nababan v. Lynch*, 660 F. App'x 524, 526 (9th Cir. 2016) (Pregerson, J., dissenting). But following the law and not your heart—particularly when the two diverge—is the hard part of judging. Constrained to the strictly limited role Congress established for us, I cannot conclude that the BIA abused its discretion, and so I must respectfully dissent.

In this case, the majority remands to the BIA due to the BIA's purported failure to assess Petitioners' individualized risk as "evangelical Christians" within the broader group of Indonesian Christians generally. But in doing so, the majority relies on an expert affidavit that fails to provide any evidence or analysis showing that "evangelical Christians" are treated any differently in Indonesia than Christians generally—or, for that matter, all religious minorities. A review of that expert affidavit, Petitioners' own arguments, and the actual text of the BIA's opinion crumples the majority's rationale and shows how its holding is predicated on a distinction without a difference. To understand how far the majority strays to obtain its desired result, it is helpful to review this case in context—where Petitioners have, for over a decade, consistently characterized themselves as Seventh Day Adventist (SDA) Christians who, like most Christians, evangelize.

---

a victim's skull with golf club, committed grand larceny, and strangled the mother of his children—would likely not be tortured).

## I.

Petitioners first sought relief from removal more than a decade ago in 2008.  Before the IJ, Silalahi explained that they were SDAs who were "always . . . so terrified . . . [for] practicing our faith" in Indonesia.  She particularly focused on the fact that they were "prevented [from] spreading the word or gospel to other people."  In Indonesia, she explained, it was dangerous for them to distribute pamphlets door-to-door "or spread the word to the world about Jesus." The IJ determined, however, that Petitioners failed to show how their alleged past harm rose to the level of persecution or torture.

Petitioners appealed to the BIA and, in doing so, repeatedly emphasized their status as Christians who actively "proselytize."[2]  They pointed to their leadership roles and active engagement within the SDA church, noting that Nababan was "very active in his [SDA] Church in California, as a deacon, an associate for young families, and in spreading the gospel."  And Silalahi was "in charge of the children's ministry and proselytizes as required by her religion."  They also argued that conditions had worsened in Indonesia since they left, pointing to increasing violence against Christians, efforts to drive out non-Muslims and

---

[2] Proselytize is synonymous with evangelize.  *See Evangelizing*, THESAURUS.COM, https://www.thesaurus.com/browse/evangelizing (last visited Aug. 16, 2021).  The Merriam-Webster Dictionary defines both "proselytize" and "evangelize" as attempts to convert others to a faith. *Compare Proselytize*, MERRIAM-WEBSTERDICTIONARY.COM, https://www.merriam-webster.com/dictionary/proselytize (last visited Aug. 16, 2021) (to induce someone to convert to one's faith) *with Evangelize*, MERRIAM-WEBSTERDICTIONARY.COM, https://www.merriam-webster.com/dictionary/evangelize (last visited Aug. 16, 2021) (to convert to Christianity).

implement Sharia law, the burning of churches, the beheading and killing of Christians, and violent protests waged by the Muslim majority. "Indonesian-Christians, and Seventh Day Adventists," they argued, "are targets in a country that accepts persecution and religious intolerance." And they reiterated that "both [Petitioners] have leadership positions in their church, and both [Petitioners] are expected to recruit new members to their church, an activity prohibited in Indonesia." And because "both [Petitioners] hold important positions in their church . . . their claim is not based on a generalized fear for all Christians, but for Seventh Day Adventist Church leaders." "The more active a Christian is," they explained, "the more likely Muslim fanatics in Indonesia will target him."

The BIA dismissed Petitioners' appeal, concluding that their claims of harm for "Christians such as" Petitioners did not rise to the level of persecution or torture. A panel of our court summarily affirmed the BIA. *Nababan v. Holder*, 479 F. App'x 118 (9th Cir. 2012).

In 2012, Petitioners moved to reopen their proceedings based in part on a claimed increase of "[a]nti-Christian sentiment" in Indonesia and "their family's Christian religion." As evidence of the growth of the "anti-Christian[] climate," Petitioners pointed to harassment against persons "seeking to convert Muslims to Christianity"—the paradigm of "evangelical activities." Petitioners also referenced several other incidents of general "anti-Christian violence [that] has grown over time."

The BIA denied Petitioners' motion. It acknowledged Petitioners' SDA affiliation but concluded that Petitioners failed to establish any material change of circumstances. Another panel majority of our court summarily affirmed the BIA, again. *Nababan*, 660 F. App'x at 525.

In 2017, Petitioners filed a second motion to reopen, which is the subject of this petition. This time, however, Petitioners added a simple semantic twist. Instead of characterizing themselves as Christians who evangelize, as they had for the last decade before the agency, they now called themselves "evangelical Christians."

Not too surprisingly, however, their arguments mirrored those made in their previous filings. Just like in their original appeal before the BIA almost a decade ago, Petitioners again pointed to their leadership roles within their SDA church and argued that they were afraid to return to Indonesia because of their active involvement within the SDA church. Although Petitioners now occupied different leadership roles—Nababan served as a Deacon and Church Elder and Silalahi served as a Deaconess—they did not explain how their different leadership roles resulted in any increased risk. Also, as in their original appeal before the BIA, Petitioners pointed to violence and harassment targeting Christians, the promotion of Sharia law, the rise in Islamic fundamentalism, the burning of churches—including SDA churches—and violent protests waged by Muslims. And throughout their motion, Petitioners alternated between referring to "evangelical Christians" and Christians who evangelize.

Petitioners submitted two expert affidavits in support of their second motion to reopen from Dr. Winters and Professor Mark Cammack. Both affidavits purported to address the "threats facing Indonesian evangelical Christians." On close inspection, however, aside from their introductory and conclusory summaries, neither affidavit actually addressed how "evangelical Christians" as a group are situated any differently from just "Christians" generally in Indonesia—or, for that matter, any differently from all other religious minorities.

Dr. Winters's 25-page affidavit, for example, focused almost exclusively on "[c]ountry conditions for religious minorities" in Indonesia, and never attempted to explain why "evangelical Christians" are subject to a different risk of persecution than Christians in general, or even religious minorities in general.  He began his affidavit by summarily concluding that Petitioners face "increasing persecution" because of their "status as evangelical Christians," but then proceeded to discuss religious minorities for the next eighteen pages of his affidavit without another single reference to evangelical Christians until his conclusion at the end of the affidavit.

In the eighteen pages of his analysis, Dr. Winters summarized surveys that indicated a growing support of Islamic law, a 2013 Human Rights Watch report that evaluated "[a]buses [a]gainst [r]eligious [m]inorities," the "growing trend of religious intolerance," and attacks "against religious minorities such as the Ahmadis, Shia, Christians, and Bahai."  Notably, many of the incidents that Dr. Winters recounts in his report occurred around or before the time of Petitioners' first motion to reopen, making them irrelevant to Petitioners' required showing of materially "*changed* country conditions."  Dr. Winters also discussed the Indonesian government's treatment of religious minorities, the general awareness that "attacks on Ahmadis, Shiites and other minority groups will continue," and 2013 and 2014 U.S. State Department reports that found that conditions were deteriorating for "religious minorities" in Indonesia.  None of these reports specifically focused on Christians in general, much less "evangelical Christians."

Dr. Winters also summarized several Indonesian news articles that, again, focused on "intolerance against religious minorities."  Dr. Winters then briefly described a visit to

Indonesia where he met with the U.S. Ambassador to discuss political Islam in Indonesia and "the serious threats these trends posed for the country's stability, and especially for vulnerable religious minorities."  His affidavit makes no reference to any of these discussions pertaining specifically to the harm that Christians, much less "evangelical Christians," face in Indonesia.

After summarizing various country and media reports that only focused on religious minorities, Dr. Winters asserted that the "deterioration in conditions has a strong and negative impact on Indonesia's non-Islamic citizens, but especially the Christian minority."  Then, at the very end of his affidavit, Dr. Winters stated that the danger Petitioners faced "as evangelical Christians is vastly higher now," and that "religious intolerance in Indonesia is especially harsh against Christians who engage in proselytizing and converting fellow citizens—which is a central tenet and commitment of those of the evangelical faith." Dr. Winters's treatment of "evangelical Christians" brings to mind Wendy's "Where's the Beef?" commercials: it's all "fluffy bun" and no burger.  Other than his bare assertions at the beginning and end of his affidavit, there's simply nothing there when it comes to evidence or analysis of targeted persecution of "evangelical Christians" in Indonesia.[3]

The only thing Dr. Winters's treatment of "evangelical Christians" in his affidavit demonstrates is that he doesn't really consider them to be situated differently from any other

---

[3] Like Dr. Winters, Professor Cammack's affidavit similarly mentioned "evangelical Christians" in the first paragraph, but then focused on violations of religious freedom and harassment of Christians in general, without mention or citation to sources that treated evangelical Christians as a separate persecuted group in Indonesia.

"religious minority" in Indonesia—including, Christians generally. His affidavit also illustrates what the majority's decision in this case studiously ignores: that "evangelical Christians" and "Christians who engage in proselytizing" are the same thing.[4] This is important because, as discussed below, the majority faults the BIA for somehow not having considered Petitioners' "identity as evangelical Christians," despite the fact that the BIA clearly considered that they are "active members of the Seventh Day Adventist (SDA) Church, *a tenet of which is to spread the Gospel.*" (emphasis added).

The BIA evaluated Petitioners' arguments, expert affidavits, and supporting evidence, and denied their second motion to reopen. In its decision, it expressly acknowledged that Petitioners "have offered evidence that they are active members of the Seventh Day Adventist (SDA) Church, a tenet of which is to spread the Gospel." Pursuant to both the common understanding and literal definition of the word "evangelize," which means "preach[ing] the gospel," the BIA therefore explicitly addressed the evangelical requirements of Petitioners' SDA denomination.[5]

---

[4] The same is true for Professor Cammack, who described the Petitioners as "evangelical Christians *who seek to convert others to Christianity in accordance with the tenets of their faith.*" (emphasis added).

[5] The Merriam-Webster Dictionary defines "evangelize" as the act of "preach[ing] the gospel." *Evangelize*, MERRIAM-WEBSTERDICTIONARY.COM, https://www.merriam-webster.com/dictionary/evangelize (last visited June 18, 2021). It further defines "preach" as the act of "set[ting] forth in a sermon," "advocat[ing] earnestly," or "deliver[ing] (something, such as a sermon) publicly." *Preach*, MERRIAM-WEBSTERDICTIONARY.COM, https://www.merriam-webster.com/dictionary/preach (last visited June 18, 2021).

But the BIA didn't stop there.  It then considered the particular facts of Petitioners' situation, noting that "Nababan[] has recently been elected to be an Elder of the respondents' congregation; and [Silalahi] is now a deaconess of their congregation."  "*Given their status as church leaders*, and current conditions in Indonesia," the BIA continued, Petitioners "fear that Muslim radicals in Indonesia will attack them, or the Indonesian Government will arrest them for blasphemy." (emphasis added).  It also cited to the portions of Petitioners' brief where Petitioners discussed their fear of returning to Indonesia because of their evangelical activities.  In recognizing Petitioners' leadership roles in the evangelical SDA denomination, the BIA implicitly reinforced what it earlier explicitly recognized: that Petitioners would be involved in evangelizing.

The BIA then proceeded with its analysis, where it noted that Protestantism—a subset of Christianity which encompasses the SDA church[6]—"received official recognition" in Indonesia since Petitioners' last removal hearing in 2009.  The BIA also considered "the evidence of attacks against Christian churches, *including an SDA church*, as well as evidence of the difficulties and obstacles faced by Christian congregations in general" (emphasis added).  By considering the "SDA church" independently from "Christian congregations in general," the BIA again demonstrated that it did, in fact, assess Petitioners' alleged individualized risk as Christians *who evangelize*.

The BIA also evaluated a country report, evidence of demonstrations against the construction of an SDA church,

---

[6] *Seventh-day Adventists*, BBC, https://www.bbc.co.uk/religion/religions/christianity/subdivisions/seventhdayadventist_1.shtml (last visited Aug. 16, 2021).

and numerous news articles provided by Petitioners and their experts.  To the extent that these sources discussed specific anti-Christian sentiment at all, like Petitioners' experts they discussed harassment against Christians in general or SDA churches—none specifically referenced the plight of "evangelical Christians" per se.  The BIA further acknowledged "statements prepared specifically for this motion by Jeffrey A. Winters, Ph.D., and Mark E. Cammack, J.D. . . . [and] a statement from [Silalahi]'s father, also a member of the SDA Church in Indonesia, who states that he was beaten by Muslims in 2017 for providing a Bible and religious instruction to a Muslim."  (citations omitted).  This was more evidence of evangelistic activities that the BIA considered.

The BIA ultimately concluded, however, that Petitioners' new leadership roles in the SDA denomination reflected a change in personal circumstances instead of materially changed conditions in Indonesia, and that the "evidence now before [it] . . . does not reflect materially changed conditions affecting [Petitioners]' 'individualized risk' of persecution to warrant reopening."  Since the BIA explicitly acknowledged and evaluated: (1) the SDA church's evangelical nature; (2) Petitioners' leadership roles in that church; (3) the documentary evidence pertaining to attacks against an SDA church, the experts' statements "prepared specifically for this motion," and blasphemy charges against a popular Indonesian politician, and (4) the portions of Petitioners' brief specifically discussing the harm Petitioners feared due to their evangelical activities, the BIA's reference to Petitioners' "individualized risk" clearly considered Petitioners' claimed status as Christians who evangelized.  Upon consideration of this evidence, the BIA determined that Petitioners did not meet their heavy burden

required for reopening and denied their second motion to reopen.

## II.

Notwithstanding the BIA's thorough consideration over more than a decade of Petitioners' status as Christians who evangelize, the majority now remands due to the BIA's purported failure to explicitly assess Petitioners' risk as "evangelical Christians."   As explained, nobody—not Petitioners, not their experts, and none of the articles they provided—provided a stitch of evidence in support of Petitioners' motion to reopen evincing that "evangelical Christians" as a separate group are exposed to a higher risk of persecution in Indonesia than Christians in general, or even religious minorities generally.  Our court once again faults the BIA for not addressing something that was never actually presented to the BIA to address.[7]

---

[7] The majority disagrees, emphasizing that "Petitioners moved to reopen principally on the basis that they faced a unique risk of persecution as evangelical Christians," and so their "unique" status as "evangelical Christians" was "clearly presented to the BIA."  I'm not talking about mere semantics.  As this dissent explains at length, I agree that Petitioners and their experts sometimes referred to themselves as "evangelical Christians" in their most recent motion to reopen documents (while also sometimes referring to themselves merely as "Christians" or "religious minorities").  But I strongly disagree that they did anything more than that—that is, Petitioners and their experts never explained *why* their newly claimed label of *evangelical* Christians was any different than their prior emphasis on themselves as simply Christians . . . who evangelize.  Indeed, their interchangeable reference to themselves as Christians and *evangelical* Christians, as well as their experts' total lack of a *showing* that evangelical Christians are treated differently than Christians generally, actually undercuts that there is any substance to their semantic shift.  *That* is the "something that was never

Notably, the majority does not contend that the record compels a conclusion contrary to the BIA's with respect to Petitioners' status as Christians. Instead, in support of its conclusion, the majority notes a few instances where the BIA discussed "Christians in Indonesia" without reference to the specific word "evangelical." But in doing so, the majority entirely ignores that the BIA simply used the same label for Petitioners that they themselves and their experts repeatedly used. And in elevating its own semantics over how the parties used a term, the majority permits itself to gloss over the merits of the BIA's actual analysis—including its acknowledgement and assessment of the risk associated with Petitioners' evangelical SDA denomination. And as revealed by the Petitioners' arguments throughout the last decade (as well as their own experts' affidavits), "evangelical Christians" and Christians who "spread the Gospel" is a distinction without a difference, particularly on this record. The majority's stingy focus on the BIA's omission of the word "evangelical" (while ignoring Petitioners' identical treatment) misconstrues the BIA's actual analysis and determination, which clearly took into consideration Petitioners' risks as Christians who evangelize.

The majority's emphasis on the term "evangelical Christian" is not just absurdly fussy, it's also inherently fuzzy. The majority latches onto the term, but never defines what it means. Does the majority mean that "evangelical Christians" are a subgroup of Christianity, akin to the commonly used distinction between, say, Catholics and Protestants? Or does the majority simply mean that "evangelical Christians" refers to any "Christians" who

actually presented to the BIA," but on which the majority hangs its hat in granting the petition.

evangelize?    If the latter, this broad categorization encompasses the vast majority, if not all, Christians, which would explain why Petitioners' own experts and record materials treat "evangelical Christians" and "Christians" interchangeably.[8]   But if the former, what exactly sets this ill-defined subset of "evangelical Christians" apart from Christians generally, particularly with respect to their risk of persecution in Indonesia?    Petitioners and their experts certainly provided nothing about *that* to the BIA in this case. The majority's emphasis on "evangelical Christians," without *any* explanation as to what it means, leaves the agency and future petitioners at a loss when attempting to ascertain the appropriate analysis for the risk of persecution to "evangelical Christians."    All anyone knows is that a future petitioner really should call himself an "evangelical Christian" going forward, because that has magic power before our court.[9]

---

[8] *See Matthew* 28:18–20; *see also* Francis X. Rocca, Yelin Hong, and Josh Ulick, *How the Catholic Word Is Changing*, WALL STREET JOURNAL, http://graphics.wsj.com/catholics-world/ (last visited Aug. 16, 2021) ("Despite the church's focus on charitable work rather than winning converts . . . conversions are an important byproduct of Catholic social service projects in Africa."); Paul Senz, "*All Christians are called to evangelism*", THE CATHOLIC WORD REPORT (Nov. 16, 2019), https://www.catholicworldreport.com/2019/11/16/all-christians-are-called-to-evangelism/.

[9] The majority's response to my criticism in this respect validates my point.  In the same footnote it conflates "an 'evangelical Christian, for whom public proselytizing is a religious obligation,'" with being "members of a well-known evangelical church."  The term "evangelical church," as it is commonly used, is different than Christians who proselytize (which, as I've explained, would include many, if not most, Christians).  Even the majority isn't really sure what activities or unique status its new magic word encompasses, which is not terribly surprising

The majority also relies on Dr. Winters's affidavit as evidence that "evangelical Christians" face a risk of harm separate from Indonesian Christians generally. But an expert affidavit that sandwiches the meat of its analysis (which, as discussed, was focused solely on religious minorities, not "evangelical Christians") between wholly conclusory references to "evangelical Christians" isn't evidence. It's naked semantic legerdemain, which the BIA easily recognized as such, but apparently our court can't. Dr. Winters fails to cite *any* support showing that "evangelical Christians" are treated differently than other religious minorities in Indonesia.

The majority's reliance on Dr. Winters's affidavit also runs afoul of numerous courts that have determined that Dr. Winters's assertions could not overcome the BIA's broad discretion in denying Petitioners' requested relief, especially given the BIA's reliance on other parts of the record that did not support Dr. Winters's conclusion—just as the BIA did here.[10]   Indeed, at least one of our sister

---

since the record in this case is of no help in that regard. The majority just knows it has mystical power, which the BIA should divine on remand.

[10] *See Sugiarto v. Holder*, 761 F.3d 102, 104 (1st Cir. 2014) ("[A]s with a very similar affidavit from Dr. Winters discussed in *Marsadu* . . . , the Board did not abuse its discretion in finding that the Winters Affidavit showed only . . . a mere continuation of prior conditions . . . ." (citation and internal quotation marks omitted)); *Marsadu*, 748 F.3d at 59 ("That Dr. Winters's report did not deliver a decision in their favor . . . does not entail a sufficient affront to the broad discretion we afford the BIA on motions to reopen."); *Lie v. Holder*, 729 F.3d 28, 31 (1st Cir. 2013) ("We find it notable . . . that the Third Circuit has denied petitions for review in at least two cases where this same expert was used to establish the existence of persecution of Christian and ethnic-Chinese Indonesians."); *Tan v. Att'y Gen. U.S.*, 568 F. App'x 96, 99–100 (3rd

circuits has declined to reevaluate the weight the BIA gave to Dr. Winters's affidavit, noting that "a challenge to how the BIA weighed the evidence . . . is unavailing." *Marsadu v. Holder*, 748 F.3d 55, 59 (1st Cir. 2014).

The majority ignores all this, instead selectively quoting one phrase from the beginning of Dr. Winters's affidavit. To the extent that Dr. Winters's discussion of religious minorities in general could be interpreted as necessarily extending to evangelical Christians—which would be the only explanation for relying on Dr. Winters's otherwise unsupported statement quoted by the majority—well, then, we're back at square one. If evangelical Christians are persecuted *like any other religious minorities*, then the majority has no basis to draw some ephemeral distinction between Christians and evangelical Christians as its sole justification for remanding to the BIA. The majority attempts to distinguish evangelical Christians as some sort of separate, undefined sub-group of Christianity based on an expert affidavit that spends 18 pages demolishing that distinction.

The majority's misplaced reliance on Dr. Winters's affidavit highlights a bigger problem in this court—which is overturning a BIA decision *on an abuse of discretion standard* based on an expert report that does not actually demonstrate what the majority asserts. *See*, *e.g.*, *Bautista v. Barr*, 822 F. App'x 535, 537 (9th Cir. 2020) (VanDyke, J., dissenting in part and concurring in part). Simply citing an

---

Cir. 2014) (per curiam); *Soetiono v. Att'y Gen. U.S.*, 431 F. App'x 150, 155–56 (3rd Cir. 2011) (per curiam); *Tanzil v. Att'y Gen. of U.S.*, 426 F. App'x 104, 108 (3rd Cir. 2011) (per curiam) ("Dr. Winters's testimony criticizes piecemeal reform efforts and predicts future violence, but is similarly inconclusive." (citation and internal quotation marks omitted)).

expert affidavit for its purported imprimatur—and then selectively quoting from that affidavit while ignoring its actual content—cannot be a legitimate basis for circumventing our highly deferential abuse-of-discretion review.    Like chewing your fingernails, contorting the arguments and reweighing the evidence that were actually before the BIA in order to reach a desired outcome— especially when operating under a highly deferential standard of review—is a "nasty habit" that judges on our court should at least try to kick.  *See Sanchez Rosales v. Barr*, 980 F.3d 716, 721 (9th Cir. 2020) (VanDyke, J., dubitante).

But not today, apparently.    The majority clings to a myopic focus on the phrase "evangelical Christians," which the record reveals is at most mere semantics and a misrepresentation of the BIA's decision.  Simply because the BIA did not ritualistically chant the precise phrase "evangelical Christians" in its decision cannot be a reason to ignore that the BIA appropriately considered the particular risk that Petitioners might face as Christians who evangelize.

Once we strip away the majority's magic-word requirement, we're left with the question of whether Petitioners have shown enough of a change in country conditions to surmount the high bar for reopening.  The law is highly deferential in this area: not only do "[w]e review denials of motions to reopen for abuse of discretion," *Najmabadi v. Holder*, 597 F.3d 983, 986 (9th Cir. 2010), but our court has layered this standard on top of substantial evidence review.  *See id.* at 991 ("[S]ubstantial evidence supports the Board's finding that the evidence [the petitioner] submitted in her motion to reopen was not qualitatively different from the evidence presented at the original hearing.").  The BIA addressed this exact question, in such a way that not even the majority can pretend is wrong

without inventing some undefined group the BIA supposedly failed to consider.**[11]**

For all these reasons, I would hold that the BIA showed "proper consideration of all factors," *Bhasin v. Gonzales*, 423 F.3d 977, 983 (9th Cir. 2005), and did not abuse its

---

**[11]** Contrast the BIA's determination in this case with the two out-of-circuit cases the majority also relies on in support of its conclusion. In *Sihotang v. Sessions*, the First Circuit remanded to the BIA while noting that "the BIA never even mentioned terms remotely resembling 'evangelical' or 'proselytize' in its opinion." 900 F.3d 46, 51 (1st Cir. 2018). The BIA also "appear[ed] to have completely overlooked critical evidence." *Id.* As discussed above, the BIA's opinion here both explicitly mentioned terms that are synonyms for "evangelical" and "proselytize," and it considered evidence directly pertaining to Petitioners' evangelical denomination. And in *Liem v. Attorney General United States*, the Third Circuit viewed "evangelical Christians" and those who "practice [their faith] publicly" to be the same, much like the BIA did here. 921 F.3d 388, 400 (3rd Cir. 2019). Specifically, the court granted the petition for review due to the BIA's complete failure to address various exhibits pertaining to the alleged persecution of—not "evangelical Christians"—but *Christians in general*. *Id.* at 396–400. Then in dicta, it also observed that "the [First Circuit]'s ruling in *Sihotang* rested in large measure on the changed country conditions in Indonesia for *all* Christians." *Id.* at 400. And in even more dicta, it opined that "to the extent [*Sihotang*]'s ruling rested on the distinction between those who practice their faith privately and those who practice publicly, there is evidence here that [the petitioner]'s faith may involve a similarly public component" which "might be uniquely problematic for [the petitioner]." *Id.* (citation and internal quotation marks omitted). This "public component," however, consisted of the petitioner's "tak[ing] care of [] church services" as a church deacon and "meet[ing] the needs of the people in the community." *Id.* Apart from the fact that this conclusion is neither binding nor determinative, I'm not aware of any Christian denomination that does not consider those "public components" to be important aspects of the Christian religion in general.

considerable discretion in denying Petitioners' second motion to reopen.