# United States Court of Appeals
## For the First Circuit

No. 18-1911

CATHERINE LEONI NANTUME,

Petitioner,

v.

WILLIAM P. BARR,
Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Howard, <u>Chief Judge</u>,
Torruella and Selya, <u>Circuit Judges</u>.

<u>Melanie Shapiro</u>, with whom <u>Law Office of Melanie Shapiro</u>, <u>Harvey Kaplan</u>, and <u>Harvard Law School Immigration and Refugee Clinic at Greater Boston Legal Services</u>, were on brief, for petitioner.
<u>Scott Grant Stewart</u>, Deputy Assistant Attorney General, Civil Division, U.S. Department of Justice, with whom <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Kiley Kane</u>, Senior Litigation Counsel, Office of Immigration Litigation, and <u>Jane T. Schaffner</u>, Trial Attorney, Office of Immigration Litigation, were on brief, for respondent.

July 23, 2019

**SELYA**, **Circuit Judge**.  In Sihotang v. Sessions, 900 F.3d 46 (1st Cir. 2018), we explained that "[m]otions to reopen — especially untimely motions to reopen — are disfavored in immigration cases.  Consequently, an alien who seeks to reopen removal proceedings out of time ordinarily faces a steep uphill climb."  Id. at 48.  This case aptly illustrates the difficulty of the ascent.

We do not gainsay that the conditions the petitioner must face in her homeland are disturbing — but the Board of Immigration Appeals (BIA) determined that those conditions had not materially changed during the relevant period; they simply had persisted.  Mindful both that our standard of review is deferential and that hard cases often have the potential to make bad law, see United States v. Clark, 96 U.S. 37, 49 (1877) (Harlan, J., dissenting) (quoting Lord Campbell in East India Co. v. Paul, 7 Moo. P.C.C. 111); Lopez de Hincapie v. Gonzales, 494 F.3d 213, 221 (1st Cir. 2007), we uphold the BIA's refusal to reopen the petitioner's removal proceedings.

## I. BACKGROUND

The petitioner, Catherine Leoni Nantume, is a Ugandan national.  In October of 2001, she entered the United States by means of a visitor's visa, which allowed her to remain for six months.  She overstayed and, following her marriage to a male

United States citizen, became a lawful permanent resident in March of 2004.  See 8 U.S.C. § 1186a(a).

The government subsequently challenged the validity of the marriage and, nearly eight years after the fact, proved that it was a sham.  The petitioner was convicted of conspiring to defraud the United States, see 18 U.S.C. § 371, and the district court sentenced her to a one-year term of immurement.  While serving her prison sentence, the petitioner met a female prisoner with whom she developed a romantic relationship.  This relationship outlasted the petitioner's incarceration and led to the petitioner "coming out" as a lesbian.

Shortly after the petitioner's release from custody, removal proceedings began.  At a hearing held on February 20, 2014, the petitioner admitted the factual allegations set out in the charging document (the Notice to Appear) and conceded removability.[1]  She later conceded that she was not eligible for any relief from removal.  The immigration judge (IJ) ordered her removed to Uganda on May 12, 2014 — a final agency order that the petitioner did not appeal.

---

[1] Although the petitioner conceded removability on other grounds, she did not concede that she was an alien who had been convicted of a crime involving moral turpitude.  See 8 U.S.C. § 1182(a)(2)(A)(i)(I); id. § 1227(a)(2)(A)(i).  Her efforts to defeat that charge ultimately proved unsuccessful.

Roughly two months later, the petitioner — represented by new counsel — filed a timely motion to reopen her removal proceedings, seeking to apply for asylum, withholding of removal, and protection under the United Nations Convention Against Torture (CAT). She likewise sought a stay of removal. The petitioner predicated these filings namely on her recent self-identification as a lesbian, which established her membership in the lesbian, gay, bisexual, and transgender (LGBT) community. At the same time, she complained of the passage of a new law in Uganda (signed on February 24, 2014) that criminalized homosexuality as a felony offense. On August 11, 2014, the IJ denied the petitioner's motion to reopen, finding that the evidence on which she relied — that is, the evidence of her nascent sexual identity and the passage of the anti-homosexuality law — was previously available and could have been discovered and presented at her merits hearing. The BIA rejected the petitioner's appeal of this denial on February 6, 2015. The petitioner did not seek judicial review of the BIA's ruling.

Matters remained in limbo for more than three years. On June 25, 2018, the petitioner again attempted to revive her case. This time, she filed a motion to reopen before the BIA, along with a motion for a stay of removal. Her second motion to reopen was strikingly similar to her first: it sought the same relief on nearly the same grounds, save for an added reference to a new

Ugandan law, enacted in 2016.  Because the petitioner's second motion to reopen was untimely, she attached a trove of documents (including country conditions reports, family correspondence, photographs, and a psychiatric assessment) aimed in part at showing changed circumstances.  Notwithstanding these submissions, the BIA denied the motion, determining that it was procedurally barred and that the petitioner had failed to establish a material change in Ugandan country conditions.  This petition for judicial review followed.[2]

## II. ANALYSIS

In her petition for judicial review, the petitioner challenges the BIA's denial of her second (untimely) motion to reopen. She insists that the "evidence shows a deterioration of conditions for LGBT individuals in Uganda" during the relevant period.  In her view, we should order the case reopened and remand for a full evidentiary hearing.

We preface our discussion of these claims with familiar lore.  "Motions to reopen removal proceedings are disfavored because they impinge upon 'the compelling public interests in

---

[2] In the interim between the BIA's denial of her second motion to reopen and oral argument in this court on her petition for review, the petitioner was removed to Uganda.  Her removal does not affect the justiciability of her petition for review.  See Bolieiro v. Holder, 731 F.3d 32, 38-39 (1st Cir. 2013) (rejecting "proposition that the post-departure bar precludes a noncitizen who has departed the country from vindicating her statutory right to seek reopening").

finality and the expeditious processing of [immigration] proceedings.'" Sihotang, 900 F.3d at 49 (quoting Bbale v. Lynch, 840 F.3d 63, 66 (1st Cir. 2016)). Consequently, "we review the BIA's denial of a motion to reopen under a highly deferential abuse-of-discretion standard." Pineda v. Whitaker, 908 F.3d 836, 840 (1st Cir. 2018). To "prevail under this standard, the movant must carry the heavy burden of establishing that the BIA made an error of law or acted in a manifestly arbitrary or capricious manner." Roberts v. Gonzales, 422 F.3d 33, 35 (1st Cir. 2005).

We recognize, of course, that "[a]ppellate review in this esoteric corner of the law plays out against a well-defined statutory and regulatory mosaic." Beltre-Veloz v. Mukasey, 533 F.3d 7, 10 (1st Cir. 2008). The pieces of the mosaic that are most prominent here set forth specific constraints on motions to reopen. Such initiatives are restricted to a single motion to reopen, which must be filed within ninety days of the final agency order. See 8 U.S.C. § 1229a(c)(7); 8 C.F.R. § 1003.23(b). These restrictions, though, are not immutable: they may be relaxed if an alien can establish "changed country conditions arising in the country of nationality or the country to which removal has been ordered." 8 U.S.C. § 1229a(c)(7)(C)(ii).[3]

---

[3] Here, the country of nationality and the country of removal are one and the same: Uganda.

To fit within the narrow confines of the exception applicable to untimely motions to reopen, an alien must breach two barriers. First, the alien must show that the change in country conditions is material and must support that showing by evidence that was either unavailable or undiscoverable at the time of her merits hearing. See Garcia-Aguilar v. Whitaker, 913 F.3d 215, 218 (1st Cir. 2019). Second, the alien must show prima facie eligibility for the substantive relief that she seeks (here, asylum, withholding of removal, and CAT protection). See Chen v. Lynch, 825 F.3d 83, 87 (1st Cir. 2016). The alien must carry the devoir of persuasion with respect to both of these requirements. See id.; see also 8 U.S.C. § 1229a(c)(7)(B), (C)(ii).

For present purposes, we may start and end with the first requirement: changed country conditions. In evaluating whether the petitioner has satisfied this requirement, the BIA must compare "the evidence of country conditions submitted with the motion to those that existed at the time of the merits hearing." Liu v. Holder, 727 F.3d 53, 57 (1st Cir. 2013) (quoting In re S-Y-G-, 241 I. & N. Dec. 247, 253 (BIA 2007)). "If the newly submitted evidence reveals no more than a continuation of previously existing conditions, it is inadequate to show changed country circumstances." Chen, 825 F.3d at 87; see Mejía-Ramaja v. Lynch, 806 F.3d 19, 21 (1st Cir. 2015). Even where, as here, an alien asserts a change in her personal situation along with changed

- 7 -

country conditions, she must still establish a material change in country conditions to cross the evidentiary threshold.  See Wang v. Lynch, 795 F.3d 283, 286 (1st Cir. 2015).

The chief claim of error mounted in this case relates to the denial of the petitioner's untimely second motion to reopen. The petitioner tries to circumvent the time-and-number bar by arguing that the evidence she submitted to the BIA demonstrated changed country conditions, specifically, the intensification of persecution of LGBT individuals in Uganda.[4]

This argument is belied by the record, which makes manifest that Uganda has historically and persistently discriminated against individuals who engage in same-sex sexual activity.  For instance, one of the country conditions reports tendered by the petitioner states unequivocally that "[c]onsensual same-sex sexual conduct is illegal according to a colonial era law."[5]  In other words, official hostility toward homosexual activity in Uganda long predated the petitioner's applications for relief.

---

[4] As the government points out, some documents relied upon by the petitioner in this court (including an assortment of Ugandan legislative materials) were never submitted to the BIA.  In as much as we are constrained to consider only the record that was before the agency, see Tay-Chan v. Holder, 699 F.3d 107, 111 (1st Cir. 2012), these additional documents cannot be taken into account, see 8 U.S.C. § 1252(b)(4)(A).

[5] This reference to the "colonial era" is clearly a reference to the time when Uganda was a British colony.  Uganda gained its independence in 1962.

To be sure, the submitted materials reflect an ongoing animus toward LGBT individuals in Uganda (manifested through harassment, violence, and the like). The record contains nothing, however, that fairly suggests a deepening of this animus over the relevant period. Instead, it discloses that the criminalization of same-sex sexual activity has "remained" official policy. Cf. Cabas v. Barr, ___ F.3d ___, ___, (1st Cir. 2019) [No. 18-1630, 2019 WL 2723367, at *3] (finding intensification where occasional violence morphed into frequent violence). Put bluntly, the situation is dreadful — but it has been dreadful throughout the relevant period. The petitioner's submissions fail to show that the level of hostility, persecution, or other mistreatment intensified between May of 2014 (when the merits hearing concluded) and June of 2018 (when the petitioner's second motion to reopen was filed).

In an effort to obscure this reality, the petitioner points to two recent laws enacted in Uganda (one in 2014 and the other in 2016). These enactments, she says, made the situation worse and, thus, the BIA abused its discretion in finding no material change in country conditions. We do not agree.

- 9 -

To begin, the 2014 anti-homosexuality statute was signed into law <u>before</u> the petitioner's merits hearing[6] and, therefore, was available and discoverable at the time of that hearing. In any event, the 2014 statute was nullified by the Ugandan Constitutional Court shortly after the statute took effect. Plainly, then, the 2014 law is a nullity and, a fortiori, does not denote a material change in country conditions.

The 2016 law cited by the petitioner — the Non-Governmental Organizations Act (NGO Act) — was signed by Uganda's president in January of 2016. It was, therefore, unavailable to the petitioner at her merits hearing.

The petitioner submits that the NGO Act "makes it more difficult for LGBT advocacy organizations to operate." The BIA acknowledged that this might be so, but it found that such a tangential effect did not amount to a material change in country conditions because it did "not materially change the treatment of LGBT individuals" in Uganda. This finding is supported by the 2017 State Department Country Report (2017 Country Report), which specifically mentions the NGO Act but does not identify any impact that it might have on the treatment of LGBT individuals in Uganda. Considering the record as a whole, we are satisfied that the BIA

---

[6] In her second motion to reopen, the petitioner represented that her merits hearing concluded on May 12, 2014. Despite some ambiguity in the record, we hold her to this representation.

acted within the wide margins of its discretion in determining that the NGO Act did not signal a material change in country conditions.

The petitioner has a fallback position. She contends that the BIA abused its discretion by "neglect[ing] to consider . . . the 2017 State Department's Country Report on Uganda." This contention is unconvincing.

It is common ground that the BIA is under no obligation "to parse an alien's submissions one by one and cite book and verse when rejecting the alien's conclusions." Garcia-Aguilar, 913 F.3d at 221. This principle has particular pertinence here because the petitioner submitted a compendium of country conditions reports as a single exhibit (Exhibit G), and the BIA cited Exhibit G in its decision. We have no basis for concluding that the BIA cited Exhibit G without reviewing its component parts. Cf. Raza v. Gonzales, 484 F.3d 125, 128 (1st Cir. 2007) (observing that "[i]t is enough if the agency fairly considers the points raised by the complainant and articulates its decision in terms adequate to allow a reviewing court to conclude that the agency has thought about the evidence and the issues and reached a reasoned conclusion").

There is another — and more important — reason why the petitioner's contention faces strong headwinds. The petitioner points to nothing in the 2017 Country Report that plausibly suggests the existence of a material change in country conditions

for LGBT individuals.  Nor does she point to any meaningful inconsistency between the 2017 Country Report and the BIA's decision.

Of course, the 2017 Country Report does describe the "criminalization of same-sex consensual sexual conduct" as one of "[t]he most significant human rights issues" in Uganda.  But that report does not indicate that the significance of the issue has increased over the relevant period; to the contrary, it makes pellucid that consensual same-sex conduct has been criminalized ever since Uganda attained its independence.  Thus, the report "reveals no more than a continuation of previously existing conditions."  Mejía-Ramaja, 806 F.3d at 21.

The personal documents that the petitioner submitted to the BIA (including correspondence and a psychiatric assessment) do not require a different conclusion.  The letters are mostly from family members, who express concern for the petitioner's safety in Uganda due to the mistreatment faced by LGBT individuals; the psychiatric assessment attests to the petitioner's LGBT identity.  Those documents would have undeniable relevance were we to reach the question of the petitioner's prima facie eligibility for asylum.  See Perez-Rabanales v. Sessions, 881 F.3d 61, 66-67 (1st Cir. 2018); see also Kadri v. Mukasey, 543 F.3d 16, 21 (1st Cir. 2008) (noting that "[s]exual orientation can serve as the foundation for a claim of persecution, as it is the basis for

- 12 -

inclusion in a particular social group").  We do not reach that question:  given the posture of this case, the petitioner must first establish that there has been a material change in country conditions.  See Wang, 795 F.3d at 286 ("A change in personal circumstances alone does not meet the standard for the exception to the time bar for changed country conditions.").

The petitioner nonetheless asserts that her "coming out" as a lesbian, evidenced by certain of these submissions, is relevant to an assessment of whether country conditions in Uganda have materially changed.  This assertion is unpersuasive.  Although the petitioner's "coming out" may mark a significant change in her personal circumstances, any such change would be relevant only to the extent that she can also demonstrate that conditions have worsened generally for LGBT individuals in Uganda.  See id. at 286-87.  She has failed to make such a showing.

The short of it is that nothing in the collection of personal documents submitted by the petitioner undermines the BIA's finding that that "Uganda has longstanding animus towards [the] LGBT community."  Accordingly, we conclude that the BIA acted within its discretion in finding that the papers submitted with the petitioner's second motion to reopen demonstrated a persistence of negative conditions for members of the LGBT community in Uganda, not a material change in those conditions.  See Lie v. Holder, 729 F.3d 28, 31 (1st Cir. 2013).  "That

conditions have failed to improve is not enough to show that they have changed." Mejía-Ramaja, 806 F.3d at 21. Based on the record before us, there is no principled way in which we can say that the BIA abused its discretion in finding that the petitioner failed to show a material change in country conditions.

Let us be perfectly clear. We have no illusions about what is happening in Uganda with respect to LGBT individuals. See, e.g., Sexual Minorities Uganda v. Lively, 899 F.3d 24, 29 n.1 (1st Cir. 2018) (reviewing appeal in case arising out of "vicious and frightening campaign of repression against LGBTI persons in Uganda" (quoting Sexual Minorities Uganda v. Lively, 254 F. Supp. 3d 262, 264 (D. Mass. 2017))). We regard the views of the Ugandan government toward members of the LGBT community as benighted, and we know that the petitioner's life in her homeland may prove trying. But the conditions that confront LGBT individuals in Uganda, though disturbing, are not new. Those conditions have persisted for decades, and they have not materially changed in the relatively brief interval between the conclusion of the petitioner's 2014 merits hearing and the filing of her 2018 motion to reopen.

The Executive Branch has the power to assist aliens trapped in this sort of cultural snare. See 8 U.S.C. § 1182(d)(5)(A) (granting Attorney General discretion to "parole into the United States . . . on a case-by-case basis for urgent

humanitarian reasons . . . any alien applying for admission to the United States").  But courts are bound by a more rigid framework of legal rules and cannot reconstruct those rules to achieve particular results.  It follows that our antipathy for certain of the norms that prevail in Uganda, without more, does not authorize us to bar the removal of a Ugandan national to that country.

## III. CONCLUSION

We need go no further.  For the reasons elucidated above, we deny the petition for judicial review.


**So Ordered.**