# United States Court of Appeals
## For the First Circuit

No. 20-1667

KAREN ELIZABETH RIVERA-MEDRANO,

Petitioner,

v.

MERRICK B. GARLAND,
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Thompson, Lipez, and Kayatta,
<u>Circuit Judges</u>.

<u>SangYeob Kim</u>, with whom <u>Gilles Bissonnette</u>, <u>Henry Klementowicz</u> and <u>American Civil Liberties Union of New Hampshire</u> were on brief, for petitioner.

<u>Greg D. Mack</u>, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, United States Department of Justice, with whom <u>Jeffrey Bossert Clark</u>, Acting Assistant Attorney General, Civil Division, and <u>Leslie McKay</u>, Senior Litigation Counsel, were on brief, for respondent.

August 26, 2022

**LIPEZ**, **Circuit Judge**.   Karen Elizabeth Rivera-Medrano, a citizen and native of El Salvador, has petitioned for review of an order of the Board of Immigration Appeals ("BIA") affirming the denial of her request for withholding of removal under 8 U.S.C. § 1231(b)(3) and protection under the Convention Against Torture ("CAT"), 8 C.F.R. §§ 1208.16(c)-1208.18, and denying her motion to remand this case to the immigration judge ("IJ") based on newly obtained evidence.[1]   We conclude that the BIA abused its discretion in denying her motion to remand.   Accordingly, we grant the petition for review, vacate, and remand for further proceedings.

## I.

### A.   Rivera-Medrano's Abuse in El Salvador

In or about 2008, when Rivera-Medrano was about nine years old, her stepfather Jose Luis Bonilla came to live with Rivera-Medrano and her mother and brother.  Rivera-Medrano asserts that Bonilla physically and sexually abused her multiple times, such as by touching her breasts and legs.  On one occasion, Bonilla came into the bedroom she shared with her brother and attempted to undress her.  After reporting this incident to her aunt, who lived next door, Rivera-Medrano and other members of her family sought help from the police.  Bonilla fled and the police did not find him.

---

[1] We refer to the BIA and IJ collectively as "the agency."

- 2 -

Rivera-Medrano and her brother then went to live with her grandmother and uncle in a different neighborhood for several years. In about 2015, she returned to live with her mother and again encountered Bonilla in the neighborhood. At first, he would simply stare at her, and Rivera-Medrano -- who was then a high school student -- attempted to avoid him. However, sometime in 2017, Bonilla approached her and threatened to "do to [her] what he was not able to do before." Rivera-Medrano believed that Bonilla was upset because his relationship with her mother had ended after Rivera-Medrano reported the incident in which he attempted to undress her.

Later, also in August 2017, Bonilla demanded that Rivera-Medrano accompany him to drop off a bag with an unidentified man, threatening to rape her if she did not comply. The man to whom they delivered the bag was tattooed with the number 18, which Rivera-Medrano believed signified the 18th Street gang. The situation with Bonilla then worsened. Several days later, he took Rivera-Medrano to a nearby riverbank, where he beat and raped her.

Rivera-Medrano and her mother reported the rape to the police soon thereafter, but Bonilla was not apprehended. Rivera-Medrano fled El Salvador shortly after making this report. After spending approximately three months in Mexico, she entered the United States in November 2017.

**B.   Rivera-Medrano's 2017 Entry and 2018 Removal Hearing**

Rivera-Medrano was stopped at the southern border and screened by a Customs and Border Protection ("CBP") officer. She did not disclose Bonilla's abuse to this officer, instead stating that she feared returning to El Salvador because she had refused to transport drugs for a gang member. She was detained and referred to an asylum officer for a credible fear interview ("CFI"), which occurred in December 2017.

During the CFI, Rivera-Medrano disclosed Bonilla's sexual assaults, including her rape in August 2017. According to the asylum officer's interview notes, Rivera-Medrano stated that she feared Bonilla would kill her if she returned to El Salvador because "when he raped me my mother called the police," but they "did not find him."[2] When asked whether she had "filed a police report," she responded that she had. The asylum officer's written summary of the interview states that "[Rivera-Medrano's] mother reported [Bonilla] to the police and the police searched for him but could not find him."

Rivera-Medrano also disclosed the incident in which Bonilla coerced her into delivering the bag. When asked by the

---

[2] The interview notes are appended to the Form I-870, a form completed by the asylum officer to assess an applicant's prima facie eligibility for relief. While the notes are presented in Q & A format, the I-870 includes a disclaimer that they are not a verbatim transcript of the interview.

asylum officer whether she had ever moved drugs, she responded "only one time," explaining that Bonilla had threatened to rape her if she did not accompany him on this errand. Asked if she thought Bonilla belonged to a gang, she responded, "I think so." The asylum officer's written summary stated that Bonilla "forced [her] to take drugs to a possible member of the 18 gang," and this portion of the summary was confirmed by Rivera-Medrano.

Rivera-Medrano was found to have a credible fear of persecution, and her case was referred to an IJ in San Antonio, Texas. She remained detained and appeared pro se before the IJ for an initial proceeding in January 2018. At that hearing, the IJ informed her that he did not have the authority to release her on bond, and he explained the potential timeline for her to submit an asylum application and appear for a merits hearing. When asked what she wanted to do, Rivera-Medrano responded, "leave to my country." Rivera-Medrano was ordered removed to El Salvador and waived her right to appeal. The IJ never addressed the merits of her fear-based claims for relief.

## C.  Rivera-Medrano's 2019 Entry

Rivera-Medrano returned to El Salvador for approximately nine months. However, she continued to fear Bonilla and fled the country again in October 2018. When she re-entered the United States in July 2019 and was stopped at the border, her prior order of removal was automatically reinstated. See 8 U.S.C.

- 5 -

§ 1231(a)(5). Nonetheless, she pursued withholding of removal under 8 U.S.C. § 1231(b)(3) and protection under the CAT. See 8 C.F.R. § 208.31. After again expressing a fear of returning to El Salvador in her entry interview, Rivera-Medrano participated in two reasonable fear interviews ("RFI").[3] According to the asylum officer's RFI notes, Rivera-Medrano referred to Bonilla having "rape[d]" her as a young child before she moved away from her mother's house.[4] The notes also indicate that, when asked how many times Bonilla raped her, Rivera-Medrano responded, "in total, three times." She also stated that, when she told the police about the 2017 rape, they told her to go home and did not "take [her] report."

Rivera-Medrano also recounted that Bonilla "made me bring a bag to a guy" when she was in high school, but said that she did not know what was in the bag. She explained that she assumed the recipient of the bag was a gang member because he was tattooed with the number 18.

The asylum officer found that Rivera-Medrano had a reasonable fear of return and referred her to immigration court

---

[3] A "reasonable fear interview" is similar to a credible fear interview, but it applies to noncitizens who are subject to a prior order of removal and are thus eligible only for withholding of removal or CAT protection. See 8 C.F.R. § 208.31.

[4] The RFI notes appear in substantially the same form as the CFI notes and include substantially the same caveat indicating that they are not a verbatim transcript.

- 6 -

for proceedings on her requests for relief. Her merits hearing was adjourned several times so that she could obtain counsel, but she was unable to do so. Thus, although she is a native Spanish speaker and does not speak or write in English, Rivera-Medrano represented herself at the hearing through an interpreter.[5]

## D.  Rivera-Medrano's Merits Hearing

In November 2019, Rivera-Medrano appeared pro se before an immigration judge in Boston, where she had been moved for detention. She testified about her childhood sexual abuse by Bonilla; that he had coerced her into delivering a bag of unknown contents to a potential gang member in 2017; that he had raped her in August 2017; and that she had reported the rape to the police, who did not take meaningful action. She became so emotional during the proceedings that the IJ stopped her testimony multiple times to give her breaks.

The government sought to raise doubts about several aspects of Rivera-Medrano's testimony by introducing the notes from her CFI and RFIs, as well as the CBP officer's summary of Rivera-Medrano's initial apprehension at the border in 2017, which was contained in a two-page document known as an I-213. Government counsel asked why she had testified at the hearing that she did

_____

[5] Rivera-Medrano submitted her withholding of removal and CAT application by using a dictionary and relying on assistance from others who were detained in the same facility.

not know for certain what was in the bag Bonilla had asked her to deliver, but had told the CBP officer and the asylum officer in 2017 that Bonilla wanted her to transport drugs. Rivera-Medrano responded that she did not recall referring explicitly to drugs in 2017 and that she "did not know [the bag's] content[s]." She also testified that she had felt intimidated by the CBP officer. She explained that "I don't like telling what happened to me, and he was saying that everything I said was a lie."

Relying on the same CFI notes, the government also pressed Rivera-Medrano on several details of the response to her rape in 2017. Government counsel noted that Rivera-Medrano had told the asylum officer that her mother called the police, who then searched for Bonilla after taking her report. At the hearing, however, she had testified that her mother had merely accompanied her to the police station and that the police did not ask questions or conduct any investigation. When cross-examined, Rivera-Medrano responded that she "remember[ed] saying [in the 2017 CFI] that we had gone to the police," but that she could not recall if the police wrote a report or if she had told the asylum officer that she had filed such a report. Turning to Rivera-Medrano's 2019 RFIs, government counsel asked Rivera-Medrano why she had told the asylum officer that Bonilla had raped her three times. Rivera-Medrano responded that she believed that the asylum officer was

mistaken. The government did not dispute, however, that the August 2017 rape occurred.

**E. The IJ's Decision**

In an oral decision, the IJ denied Rivera-Medrano's withholding of removal and CAT claims on the basis that she was not credible. His finding rested on the three areas of inconsistency between her hearing testimony and the statements attributed to her in the CFI and RFI notes that were the basis of the government's cross-examination: her statement in the CFI notes that she had been asked to deliver drugs; her statements in the CFI notes suggesting that a police report had been filed and that police searched for Bonilla after she and her mother reported the 2017 rape; and her statement in the RFI notes that she had been "raped" three times by Bonilla. The IJ found all of these statements to be inconsistent with her hearing testimony.

The IJ observed that, "[i]f this court were to have judged the respondent's credibility based on her testimony before the court upon being questioned by the court, then this court may well have found the respondent credible." However, he believed the inconsistencies between her hearing testimony and the statements attributed to her in the interview notes weighed against such a finding. He therefore concluded that Rivera-Medrano had not met her burden to prove her entitlement to withholding of removal or CAT protection.

## F.    Rivera-Medrano's Appeal to the BIA

Rivera-Medrano obtained counsel before appealing to the BIA.  In her appeal, she argued that her rights to counsel and due process had been violated at the merits hearing and that the IJ's credibility determination was not supported by substantial evidence.  She also filed a motion to remand her case to the IJ for consideration of new evidence that, she asserted, had not previously been available.

As described in more detail below, this new evidence included an evaluation and report by Dr. Stephen R. Knowlton, a clinical psychologist, who evaluated Rivera-Medrano and discussed how her post-traumatic stress disorder ("PTSD") symptomatology would have affected her ability to recount her experiences.[6]

The BIA denied Rivera-Medrano's motion to remand, upheld the IJ's adverse credibility finding, and affirmed the IJ's denial of relief.  It concluded that the new evidence submitted by Rivera-Medrano "does not resolve the discrepancies in the adverse

---

[6] Rivera-Medrano also submitted an affidavit summarizing her experiences; an affidavit from her mother confirming several aspects of her testimony; and several other documents, such as her birth certificate, her brother's birth certificate, and her aunt's death certificate.  Because our decision turns on the BIA's consideration of Dr. Knowlton's report, we do not discuss this other evidence further.

credibility finding" and therefore would not change the result.[7] This petition for review followed.

## II.

We review the BIA's denial of a motion to remand for abuse of discretion. Ticoalu v. Gonzales, 472 F.3d 8, 11 (1st Cir. 2006). "[T]he BIA may abuse its discretion 'by neglecting to consider a significant factor that appropriately bears on the discretionary decision, by attaching weight to a factor that does not appropriately bear on the decision, or by assaying all the proper factors and no improper ones, but nonetheless making a clear judgmental error in weighing them.'" Sihotang v. Sessions, 900 F.3d 46, 50 (1st Cir. 2018) (quoting Murillo-Robles v. Lynch, 839 F.3d 88, 91 (1st Cir. 2016)). Because the BIA's reasoning relied in part on the IJ's adverse credibility finding, we also review aspects of the IJ's decision. See Wanjiku v. Barr, 918 F.3d 215, 221 (1st Cir. 2019) ("When the BIA adopts the IJ's opinion and discusses some of the bases for the IJ's decision, we have authority to review both the IJ's and the BIA's opinions." (quoting Budiono v. Mukasey, 548 F.3d 44, 48 (1st Cir. 2008))).

The BIA analyzes a motion to remand based on new evidence in the same manner as a motion to reopen. See Morgan v. Holder,

_____

[7] Rivera-Medrano also asked the BIA to reopen her initial removal proceedings and/or vacate the underlying removal order issued by the IJ in San Antonio. The BIA denied this request, and Rivera-Medrano does not challenge that ruling here.

634 F.3d 53, 60 (1st Cir. 2011). To prevail on such a motion, the applicant must make three showings. First, she must demonstrate that the "evidence sought to be offered [on remand] is material and was not available and could not have been discovered or presented at the former hearing." Matter of Coelho, 20 I. & N. Dec. 464, 471 n.3 (BIA 1992) (quoting 8 C.F.R. § 3.2). Second, she must show that "the new evidence [offered] would likely change the result in the case." Id. at 473. Finally, the applicant "must make a showing of prima facie eligibility for the relief [s]he seeks." Falae v. Gonzales, 411 F.3d 11, 14 (1st Cir. 2005); see also Matter of Coelho, 20 I. & N. Dec. at 472 (noting that a motion to reopen may be denied based on failure to establish prima facie eligibility for the relief sought).

"To rehabilitate a claim that was denied based on an adverse credibility finding, a respondent must present previously unavailable evidence [to the BIA] that is independent of the prior claim or refutes the validity and finality of the credibility determination in the prior proceeding." Matter of F-S-N-, 28 I. & N. Dec. 1, 3 n.3 (BIA 2020). In assessing new evidence on a motion to reopen or remand, the BIA "cannot turn a blind eye to salient facts." Sihotang, 900 F.3d at 51 (1st Cir. 2018). Thus, the BIA abuses its discretion when it fails to "fairly appraise the record" or overlooks evidence that is critical to the justification offered for reopening. Id.

Here, the IJ's denial of withholding of removal and CAT relief rested entirely on his adverse credibility finding, and the BIA likewise denied Rivera-Medrano's motion to remand solely on the basis that it would not change this credibility assessment. We therefore limit our review to whether the BIA abused its discretion in determining that the new evidence was not "likely [to] change the result in the case." Matter of Coelho, 20 I. & N. Dec. at 471-72; see also Sihotang, 900 F.3d at 51 (considering only whether the BIA abused its discretion in analyzing the single Coelho factor on which it relied).

### III.

Rivera-Medrano argues that the BIA abused its discretion in denying her motion to remand because it failed to meaningfully consider the potential impact of her new evidence or provide a reasoned explanation as to why such evidence would not change the outcome.[8] Regarding Dr. Knowlton's report, she argues that his findings challenge the reasoning underpinning the IJ's adverse

---

[8] Rivera-Medrano also asserts that the BIA (1) violated her statutory and due process rights by presenting her 2017 CFI interview notes and I-213 form in the middle of cross-examination without adequate notice; and (2) erroneously affirmed the IJ's adverse credibility finding, which she contends was unsupported by substantial evidence. We address only her argument regarding the BIA's denial of her motion to remand because it is dispositive of the petition for review.

- 13 -

credibility determination, which was the basis for denying her relief. We agree.

In his report, Dr. Knowlton concluded, after evaluating Rivera-Medrano and her history, that she suffers from PTSD stemming from Bonilla's sexual abuse. Dr. Knowlton found that her PTSD manifested in symptoms such as strong physical reactions when reminded of traumatic events and difficulty remembering aspects of those events. He noted that it "seem[ed] 'odd' to [Rivera-Medrano] that she even now can remember many events from her childhood more clearly than she can the specifics and sequence of what happened after her rape."

He further reported that Rivera-Medrano demonstrated a marked developmental delay, noting that while she had "areas of competent cognitive functioning," this functioning was "at a much younger developmental level than her age would suggest."[9] Related to this "impaired cognition," he opined, was the fact that she had mental areas of "extreme disorganization and emotional reactivity which she tries to keep cordoned off from the rest of her consciousness." Overall, Dr. Knowlton found that Rivera-Medrano's "symptoms of PTSD make it difficult for her to recount her experiences in a consistently clear and coherent manner," and that

---

[9] Dr. Knowlton elsewhere described Rivera-Medrano's presentation as "childlike," citing her references to her desire to consult with the "adults" in her life.

"[t]his difficulty will likely become more pronounced in a situation of higher pressure, such as an asylum interview or court appearance."

However, despite the occasional discrepancies caused by her sometimes-disorganized presentation of events, Dr. Knowlton found Rivera-Medrano's account to be trustworthy because "there was no manipulative pattern to the inconsistencies." Indeed, he found that she conveyed a "marked lack of guile," citing, for example, Rivera-Medrano's acknowledgment that she could remember events from her childhood more clearly than events following her rape in 2017. He found that this phenomenon was "consistent with the cognitive disorganization experienced by victims of sexual assault."

In short, by specifically describing how Rivera-Medrano's condition affected her ability to recount her experiences, Dr. Knowlton's report challenged the foundational premise of the IJ's opinion: that Rivera-Medrano was not credible because certain details of her hearing testimony were inconsistent with other details in the CFI and RFI notes. The report also undermines several assumptions made by the IJ in reaching his conclusion that the inconsistencies were fatal to Rivera-Medrano's credibility.

First, the IJ dismissed the possibility that the inconsistencies were reconcilable with a credible account, noting

that, "[a]rguably, [Rivera-Medrano's] memory of those events would be fresher and more accurate in November of 2017 [during her CFI] than in November of 2019 [during the merits hearing], and yet, [she] denies many of the statements contained in the asylum officer's notes from the 2017 interview." Dr. Knowlton's report demonstrates that this assumption about the link between proximity in time to events and the accuracy of Rivera-Medrano's memory was misguided. To the contrary, Dr. Knowlton explains that proximity in time offers little assurance of Rivera-Medrano's accurate memory when the subject matter involves traumatic experiences such as rape, and particularly when that memory is being tested in a "situation of higher pressure" such as a CFI interview or hearing.

The IJ cited, in his oral decision, several portions of the CFI notes that touched on such traumatic subject matter. For example, he claimed that these notes "reflect that [Rivera-Medrano's] mother," Ada del Carmen, "reported the rape and a police report had been filed." He found these statements to conflict with Rivera-Medrano's hearing testimony, in which, he stated, Rivera-Medrano had testified that del Carmen did not separately report the rape herself, but merely "accompanied [Rivera-Medrano] to go to the police," and that she "did not know if [the police] wrote anything down."

Even assuming that the IJ supportably characterized these statements about del Carmen's participation as inconsistent,

we think it unlikely that the IJ would attach meaningful weight to such a trivial detail if he were aware of Dr. Knowlton's description of Rivera-Medrano's difficulty recalling events following the rape. See Ilunga v. Holder, 777 F.3d 199, 212 n.4 (4th Cir. 2015) (noting that, "[i]n the context of a credibility determination, one should expect moderate PTSD . . . to influence the content of testimony"). Similarly, the details concerning how much, if anything, police officers wrote down when she spoke to them would likely be viewed as the sort of minutiae that would be difficult for someone with Rivera-Medrano's PTSD symptoms to recall accurately and consistently. See Matter of J-R-R-A-, 26 I. & N. Dec. 609, 611 (BIA 2015) (acknowledging that mental illness or cognitive disability may cause some applicants to "exhibit symptoms that affect [their] ability to provide testimony in a coherent, linear manner").

In addition, with the benefit of Dr. Knowlton's findings about Rivera-Medrano's cognitive developmental delays and childlike presentation, the IJ also likely would have concluded -- contrary to his assumption in the oral decision -- that Rivera-Medrano's testimony should be viewed from the perspective of a child recounting her experiences. The IJ "recognize[d] that, in assessing a child's credibility or what happened to a child, the court would need to take into account unique circumstances of a child's memory and experiences."

However, he decided that Rivera-Medrano's testimony did not raise such concerns because she was eighteen years old at the time of her CFI and the rape had occurred three months earlier.

The Executive Office for Immigration Review Operating Policies and Procedures Memorandum instructs IJs to "recognize that children . . . will usually not be able to present testimony with the same degree of precision as adults." See OPPM 17-03 at 7, Guidelines for Immigration Court Cases Involving Juveniles, Including Unaccompanied Alien Children (Dec. 20, 2017), https://www.justice.gov/eoir/file/oppm17-03/download. Children may also fill in their memories with speculation about aspects of the events they are recounting or struggle to describe sequences of events in an intelligible manner. Id.

In this light, we note the imprecision remarked upon by the IJ in Rivera-Medrano's apparent reference in the RFI to the sexual abuse she experienced during her childhood as "rape." Rivera-Medrano has maintained that the 2019 RFI notes contain an error on this point and that she only ever stated that she was raped in 2017. However, even if she did mean to refer to Bonilla's attempts to undress her or touch her inappropriately as a young child as "rape" in the RFI, this reference would be entirely consistent with an imprecise or over-inclusive characterization of obviously traumatic childhood sexual abuse. We think it unlikely that the IJ -- in light of Dr. Knowlton's report and diagnosis --

would have viewed such a characterization as a basis for doubting her credibility. Indeed, it is hard to imagine any reasonable factfinder taking such a position. Cf. Fiadjoe v. Att'y Gen., 411 F.3d 135, 158 (3d Cir. 2005) ("[I]t is unreasonable to expect a person to remember whether the repeated sexual abuse she suffered at age seven constituted attempted rape or actual rape.").

We also note Rivera-Medrano's references in the CFI to being forced to transport "drugs" under the threat of rape, which the IJ found to conflict with her later testimony that she had not verified the contents of the bag she transported. The dissent diminishes the significance of Dr. Knowlton's report because it did not specifically address Rivera-Medrano's testimony about the bag. This point misapprehends the purpose of the report, which identified aspects of Rivera-Medrano's psychology that apply generally to alleged inconsistencies in her testimony. Here, Dr. Knowlton's observations about her developmental issues suggest that the IJ would likely view these earlier statements as consistent with a child's tendency to fill in knowledge or memory gaps with speculation.[10] Indeed, his report notes that Rivera-Medrano's "functional impairment" in recounting events would

---

[10] Rivera-Medrano herself appears to have characterized this earlier testimony as speculative. When asked in her 2019 RFI if she had ever told an asylum officer that she delivered "drugs," Rivera-Medrano responded "[n]o, well, maybe yes," and elaborated in her merits hearing that she "said maybe and yes because [she] didn't know for a fact what was inside the bag."

intensify in a "situation of higher pressure" such as the CFI, particularly when she was describing for the first time a clearly traumatic experience that has only recently occurred.[11]

Dr. Knowlton's account of Rivera-Medrano's PTSD symptoms is also consistent with other facts in the record and observations by the IJ. For instance, the IJ acknowledged Rivera-Medrano's "very emotional" testimony and paused the proceedings multiple times because she broke down in tears. This behavior is consistent with Dr. Knowlton's observation that Rivera-Medrano tended to experience strong physical reactions when asked to recall traumatic events. The account she gave Dr. Knowlton of the facts underlying her claims for relief was consistent with her hearing testimony as well.

For these reasons, we think it likely that the IJ would have assessed Rivera-Medrano's credibility differently in light of Dr. Knowlton's description of her diagnosis and symptomology, especially given the IJ's obligation to conduct "a reasoned analysis of the evidence as a whole." See Jabri v. Holder, 675 F.3d 20, 24 (1st Cir. 2012); see also Ilunga, 777 F.3d at 212 n.4 (instructing IJs to consider the "inherent instability" of traumatic memories in credibility determinations). Yet, the BIA

---

[11] We note, too, that the bag incident was part of Bonilla's escalating pattern of harassment of Rivera-Medrano, and occurred in August 2017 -- only days before he raped her.

did not offer any reasoned consideration of the highly relevant aspects of Dr. Knowlton's report discussed above. Rather, its discussion of Rivera-Medrano's motion to remand was limited to the following statement, bereft of any meaningful explanation:

> Although the applicant states that the psychologist's affidavit identifies her memory problems, she has not persuasively explained how the new evidence resolves the discrepancies identified by the [IJ]. As this evidence does not resolve the discrepancies in the adverse credibility finding, the applicant has not demonstrated that this evidence would change the result in her case.

In minimizing the import of Dr. Knowlton's PTSD diagnosis on Rivera-Medrano's "memory problems," the BIA failed to recognize that the report, with its particularized findings about Rivera-Medrano's cognitive delays and compromised ability to consistently recount her experiences, would likely change the IJ's dispositive credibility determination. See Matter of Coelho, 20 I. & N. Dec. at 473.

The BIA's oversight is particularly significant here, where the credibility determination rested considerably on minor inconsistencies in what the IJ concluded was an otherwise credible presentation. While the BIA "need not spell out every last detail of its reasoning where the logical underpinnings are clear from the record," it "is obligated to offer more explanation when the record suggests strong arguments for the petitioner that the [agency] has not considered." Enwonwu v. Gonzales, 438 F.3d 22,

- 21 -

35 (1st Cir. 2006) (quoting Sulaiman v. Gonzales, 429 F.3d 347, 350 (1st Cir. 2005)).  Rivera-Medrano presented such an argument, and the BIA provided no basis for its summary conclusion that the report failed to "resolve[]" the discrepancies identified by the IJ.  The BIA did not find, for example, that the report was scientifically unreliable, nor did it identify any other reason that it should not be credited.[12]  Its failure to do so in light of new evidence that was highly relevant betrays the lack of record support for its conclusion.

Finally, with respect to the dissent's warning against creating a so-called "do over" card for petitioners, this critique ignores the specificity of our analysis, grounded as it is in Dr. Knowlton's individualized findings about Rivera-Medrano's psychological damage and the ways in which these findings undermine premises critical to the IJ's adverse credibility determination. Nothing in this analysis requires the agency to reach a particular

_____

[12] The dissent argues that the BIA could supportably reject the report's findings about her recall, citing to psychological research that, in its view, might challenge some of Dr. Knowlton's conclusions.  But this information was not presented to the BIA, and the BIA did not dispute the report's scientific validity.  It would be improper for us to speculate about the effect of research that is not in the record and which was not proffered by the government.  Moreover, if Rivera-Medrano meets the other motion to remand requirements before the BIA, nothing prevents the IJ on remand from receiving contrary reports or expert opinions, or from concluding again -- after adequately accounting for new, credible information about her PTSD symptoms -- that these discrepancies undermine Rivera-Medrano's credibility.

outcome in future cases based on generalized research about trauma and memory, nor is the agency bound to credit expert testimony that it deems unreliable or irrelevant to an IJ's findings.  To the extent future petitioners do proffer reports that support the kind of particularized analysis that we engage in here, we fail to see the problem.  Such evidence would benefit agency decision-making and protect the rights of petitioners who suffer from the flawed decision-making that we see here -- the BIA's commission of a "clear judgmental error," and, hence, an abuse of its discretion, in determining that Dr. Knowlton's report was unlikely to change the outcome of Rivera-Medrano's immigration proceedings.  See Sihotang, 900 F.3d at 50 (quoting Murillo-Robles, 839 F.3d at 91).

**IV.**

Because it erroneously determined that Dr. Knowlton's report was not likely to change the result in this case, the BIA declined to reach the other showings necessary for Rivera-Medrano to prevail on her motion to remand: that the new evidence was material[13] and previously unavailable and that she has made a prima

---

[13] Given our discussion of how the report would likely impact the IJ's adverse credibility finding, we think that the new evidence is so obviously material that any reconsideration of that question would result in a foregone conclusion. See Bolieiro v. Holder, 731 F.3d 32, 41 (1st Cir. 2013).  Thus, on remand, the agency need only address whether the evidence was previously unavailable and whether Rivera-Medrano has established her prima facie eligibility for relief.  In doing so, the agency is

- 23 -

facie showing of eligibility for relief. "Where a question is best resolved by the agency in the first instance, or is left primarily in the agency's hands by statute, and the agency has failed to address that question, we generally must remand." Guta-Tolossa v. Holder, 674 F.3d 57, 61 (1st Cir. 2012); see also Pina v. Mukasey, 542 F.3d 5, 12 n.7 (1st Cir. 2008) (declining to "conduct our own de novo inquiry" on an issue the BIA did not address). If on remand the BIA determines that those two requirements have also been met, it must remand the case to the IJ for reconsideration of Rivera-Medrano's applications for withholding of removal and protection under the CAT.

We thus grant Rivera-Medrano's petition for review, vacate the BIA's decision, and remand to the agency for proceedings consistent with this opinion.

So ordered.

---

instructed to consider all relevant evidence. See Sihotang, 900 F.3d at 53.

**KAYATTA**, **Circuit Judge**, concurring in part and **dissenting in part.** Were it our job to decide in the first instance whether an IJ is likely to change his or her mind upon review of the new evidence Rivera-Medrano offers, I would side with my colleagues? But Congress has delegated this job to the BIA. And we can only set aside the BIA's judgment in the event it is marred by legal error or is arbitrary or capricious. Sanchez-Vasquez v. Garland, 994 F.3d 40, 49 (1st Cir. 2021) (explaining that a noncitizen moving to remand "must carry the heavy burden of establishing that the BIA made an error of law or acted in a manifestly arbitrary or capricious manner" (quoting Nantume v. Barr, 931 F.3d 35, 38 (1st Cir. 2019))). Given that standard, I simply do not see how we can say that the new evidence offered by Rivera-Medrano -- specifically, the Knowlton report -- is so persuasive that the BIA is required to conclude that it is likely to change the IJ's credibility finding.

The IJ's credibility finding rested on the fact that Rivera-Medrano told different stories at different times. These discrepancies were numerous and material. First, the IJ explained that Rivera-Medrano inconsistently described whether she knew a package she was asked to deliver contained drugs. Second, the IJ found that Rivera-Medrano inconsistently recounted experiencing three rapes and then one rape. And third, the IJ noted that Rivera-Medrano made contradictory statements about who reported

- 25 -

her 2017 rape and whether a police report had been filed.  Although there are alternative ways to interpret these discrepancies, we have explained that "it is for the IJ, not this court, to decide whether omissions are significant, whether inconsistencies are telling, and whether implausibilities should be accorded decretory significance."  Chen v. Holder, 703 F.3d 17, 26 (1st Cir. 2012).  And it is for the BIA -- not this court -- to determine whether new evidence would likely alter an IJ's view on these matters.  See Matter of Coelho, 20 I. & N. Dec. 464, 473 (BIA 1992) (describing the assessment as "discretionary"); see also Ticoalu v. Gonzales, 472 F.3d 8, 11 (1st Cir. 2006) (indicating that our review is only for "abuse of discretion").

My colleagues nevertheless conclude today that the Knowlton report -- which seeks to justify Rivera-Medrano's inconsistent statements as due to cognitive issues related to her past childhood trauma -- is so powerfully persuasive that any reasonable person must find that it would likely change the IJ's mind about Rivera-Medrano's credibility.  While accounts from popular media may support the a priori assumption that Knowlton's view of how memory works must be accepted, the BIA may have been less impressed.  There is certainly much science that regards Knowlton's theory of traumatic amnesia as problematic.  See Lawrence Patihis et al., Memory Experts' Beliefs About Repressed Memory, 29 Memory 823, 827 (2021) (finding that the memory experts

- 26 -

taking part in the study "were largely sceptical of repressed memories and of memory reliability in general"); see also Henry Otgaar et al., The Return of the Repressed: The Persistent and Problematic Claims of Long-Forgotten Trauma, 14 Persps. Psych. Sci. 1072, 1072-73 (2019) (describing the "contentious debate regarding the existence of repressed memories" and explaining how such "beliefs carry significant risks in clinical and legal settings").  At the very least, it seems entirely reasonable that the BIA, which regularly considers claims of flawed memory, could have had a different impression of the Knowlton report than do my colleagues.

My colleagues justify this insistence that the BIA submit to their view of how memory works by observing that the government did not produce an expert report countering it.  But if the government in an immigration proceeding put in expert testimony stating that a particular petitioner is likely lying because he appears nervous, must an IJ or the BIA accept that conclusion unless the petitioner spends the resources to procure a competing expert report?  I think not.  Rather, as should be the case here, the IJ or the BIA could simply explain why, based on its experience, it is not persuaded.  My colleagues' rejection of this reasoning also seems to overlook the fact that it is the petitioner who bears the burden of proof.  Nantume, 931 F.3d at 38.

Moreover, Knowlton's report does not resolve all of the inconsistencies noted by the IJ. In particular, it fails to address whether Rivera-Medrano knew the contents of the bag she transported on behalf of her stepfather. Rather, Knowlton's report focuses largely on the impact of childhood sexual trauma on Rivera-Medrano's mental state. To be sure, Knowlton also found that Rivera-Medrano possessed a childlike cognition and lacked guile, and, on that point, I find the Knowlton report to be reasonably persuasive. I simply do not see a basis for also saying that the BIA must agree with me.

Finally, as a practical matter, I am concerned that today's ruling will mean that reports of this kind -- i.e., evaluations from clinical psychologists about memory -- could be obtained whenever a petitioner is found to be not credible due to inconsistent descriptions of past alleged persecution. Given that the majority appears to believe these reports force the BIA's hand as long as they are not "generalized," such reports could become "do over" cards, requiring the BIA to grant petitions to reopen or motions to remand, at least unless the government spends the resources to order up a countervailing expert report to buttress what the BIA may with common sense already believe.

That being said, I do agree that the BIA itself need say more before we can decide whether to affirm its denial of Rivera-Medrano's motion to remand. The law in our circuit is clear that

"[w]here the BIA's explanation is too thin to allow us to evaluate the claims of error, we may find an abuse of discretion and remand to the BIA for further explanation." Adeyanju v. Garland, 27 F.4th 25, 51 (1st Cir. 2022). The BIA's two-sentence, quite conclusory statement that Rivera-Medrano's presentation of her new evidence does not persuasively resolve the discrepancies cited by the IJ is too thin to allow meaningful review. I therefore concur that the BIA ruling need be vacated and remanded for further consideration of the motion to remand, but I dissent from the broader mandate requiring the BIA to assign controlling weight to the Knowlton report in deciding what an IJ is likely to do.[14]

---

[14] My colleagues' holding may be broader than they acknowledge. If the Knowlton report is so convincing that the BIA abuses its discretion unless it deems that the report will likely persuade the IJ, then it is hard to see any room for the IJ to find the report unpersuasive.